2011 UT 73

**Michael Anthony ARCHULETA, Petitioner and Appellant,**

v.

**Hank GALETKA, Warden, Utah State Prison, Respondent and Appellee.**

Nos. 20070256, 20100791.

Supreme Court of Utah.

Nov. 22, 2011.

James K. Slavens, Fillmore, for petitioner.

Mark L. Shurtleff, Att'y Gen., Thomas B. Brunker, Christopher D. Ballard, Asst. Att'ys Gen., Salt Lake City, for respondent.

Justice LEE, opinion of the Court:

¶ 1 In December 1989, Michael Archuleta was convicted of first degree murder and sentenced to death for the brutal murder of Gordon Ray Church. The case has slowly worked its way through the Utah court system ever since. This opinion consolidates analysis from the fourth and fifth times that this court has entertained appeals by Archuleta. We find none of Archuleta's numerous claims in either of these appeals availing, and we accordingly reaffirm his conviction

for first degree murder and sentence of death.

## BACKGROUND

### I

¶ 2 At the time of the murder, Archuleta lived with co-defendant Lance Wood and their respective girlfriends in an apartment in Cedar City, Utah. On the evening of November 21, 1988, Archuleta and Wood went to a 7–Eleven store in Cedar City, where they met Gordon Church for the first time. After a brief conversation, the three men decided to cruise the town's main street in Church's car.

¶ 3 Later that evening, the three men drove to a secluded area in a nearby canyon. Church there told Archuleta that he was homosexual. By his own admission, Archuleta began to engage in a sex act with Church, but then thought better of it. Wood then attacked Church, tackling him to the ground, breaking his arm, and dislocating his elbow.

¶ 4 Archuleta and Wood bound Church with tire chains and a bungee cord. Placing Church in the trunk of his own car, Archuleta and Wood left the canyon and drove approximately 76 miles north to another secluded area. They removed Church from the trunk and attached battery cables to his testicles and to the car battery in a failed attempt to electrocute him. They inflicted severe blows to Church's head with a tire jack and tire iron. And they inserted the tire iron into Church's rectum, forcing it eighteen inches into his body and puncturing his liver. When Church was apparently dead, Archuleta and Wood dragged his body up a hillside and attempted to cover the body with tree branches and dirt. Church was found naked from the waist down, with a gag around his mouth and the tire chains wrapped tightly around his neck.

¶ 5 The medical examiner testified at Archuleta's murder trial that Church's face was completely distorted and that the left side of his head was concave due to multiple blows to the jaw, cheek, and eye areas with a blunt instrument. Church also had multiple bruises and lacerations on his body, including puncture wounds in his back consistent with being jabbed with pliers. According to the medical examiner, the cause of death was severe injury to the brain due to multiple blows to the head. A contributing cause of death was the penetrating injury to the liver and abdomen caused by insertion of the tire iron into Church's rectum.

¶ 6 After Archuleta and Wood abandoned Church's mangled body, they drove his car to Salt Lake City in the early morning hours of November 22. While in Salt Lake City, they visited several people. Archuleta had a good deal of blood on his pants, and he and Wood told people they met that they had been hunting and skinning rabbits. The two men hitchhiked back to Cedar City that same day.

¶ 7 Upon returning to Cedar City, Wood contacted authorities and informed them of his and Archuleta's participation in the murder. Archuleta was arrested and tried before a jury for the murder of Church in December 1989. The jury convicted Archuleta of first degree murder. Pursuant to statute, a sentencing hearing was then convened, in which the sentencing jury sentenced Archuleta to death.

¶ 8 Archuleta appealed his conviction and death sentence to this court, raising numerous claims. After examining his claims, this court affirmed Archuleta's conviction and death sentence on March 25, 1993. Archuleta filed a petition for rehearing, which this court denied on May 11, 1993. *See State v. Archuleta (Archuleta I )*, 850 P.2d 1232 (Utah 1993).

### II

¶ 9 On March 10, 1994, Archuleta filed a petition styled as a Petition for a Writ of Habeas Corpus and/or for Post–Conviction Relief in state district court. He also filed an amended petition on August 11, 1994. Archuleta's amended petition raised numerous claims that could have been but were not raised at trial or on appeal. Archuleta's petition also included claims of ineffective assistance of trial and appellate counsel.

¶ 10 In response, Respondent Hank Galetka, the warden of the Utah State Prison, filed a motion to dismiss the petition and a

motion for summary judgment. On October 4, 1996, the district court (Judge Lynn W. Davis) granted Respondent's motions. Archuleta appealed the district court's ruling to this court. We reversed in part and remanded in part, concluding that the "district court erred in ruling that the petition for a writ of habeas corpus, which was based on the allegation of ineffective assistance of counsel at trial and on appeal, was barred." *Archuleta v. Galetka* (*Archuleta II*), 960 P.2d 399 (Utah 1998). The case was accordingly remitted to the district court for a hearing on Archuleta's ineffective assistance of counsel claims.

¶ 11 On June 14, 2002, Archuleta filed a second amended petition, raising forty-three separate claims, many with numerous subclaims, challenging his conviction and death sentence. In claims one through thirty, Archuleta reasserted claims that he had raised before Judge Davis directly challenging his conviction and sentence. Each of these claims could have been but were not raised at trial or on appeal. In addition, Archuleta raised several claims of ineffective assistance of both trial and appellate counsel. Each of these ineffectiveness claims related to Archuleta's first thirty claims and alleged that trial and appellate counsel rendered ineffective assistance for failing to raise those claims at trial or on appeal. Archuleta asked the court to "issue a writ of habeas corpus" and to "discharge[ ] [him] from his unconstitutional confinement and restraint and/or [to] relieve[ ] [him] of his unconstitutional sentence of death."

¶ 12 Respondent filed a motion for summary judgment, contending that he was entitled to summary judgment on all of Archuleta's claims. Respondent asserted that Archuleta's first thirty claims directly challenging various aspects of his conviction and sentence had previously been dismissed by Judge Davis and rejected by this court in *Archuleta II*. Respondent asserted that those substantive claims were therefore procedurally barred. With respect to Archuleta's ineffective assistance of counsel claims, Respondent argued that Archuleta had pleaded insufficient facts to satisfy the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Archuleta filed a response to Respondent's motion for summary judgment, opposing summary judgment on his thirty substantive claims and on a majority of his ineffective assistance of counsel claims.

¶ 13 In an August 24, 2004 memorandum decision, the habeas court granted summary judgment for Respondent on the vast majority of Archuleta's claims. The court agreed with Respondent that all of Archuleta's non-ineffective assistance of counsel claims had been rejected by Judge Davis and that they had not been revived by *Archuleta II*. The court accordingly granted Respondent summary judgment on those substantive claims.

¶ 14 With respect to Archuleta's ineffective assistance of counsel claims, the court acknowledged that they had been revived by *Archuleta II* and were properly before the court. The court granted summary judgment to Respondent, however, on the vast majority of Archuleta's ineffective assistance of counsel claims. On some claims, the court found that Archuleta failed to oppose Respondent's motion for summary judgment. On the remaining claims, the court conducted an analysis under *Strickland* and determined that Archuleta did not present a genuine issue of material fact on one or both of the *Strickland* components.

¶ 15 Only one class of Archuleta's ineffective assistance claims survived summary judgment. On March 21 and 22 and May 17 and 18, 2006, the court conducted hearings to receive evidence regarding trial counsel's investigation into and presentation of mitigating evidence at the sentencing phase of the trial—especially evidence regarding Archuleta's upbringing and potential mental illness. In a January 22, 2007 memorandum decision, the court denied these remaining claims.

¶ 16 Archuleta appeals various facets of the habeas court's memorandum decisions from August 24, 2004 and January 22, 2007. We address the issues on this appeal in the portion of this opinion titled "Archuleta's Petition for a Writ of Habeas Corpus."

## III

¶ 17 The habeas court issued its final order on Archuleta's habeas corpus petition on February 26, 2007, and Archuleta filed a notice of appeal to this court on March 21. On February 1, 2008, Archuleta's habeas counsel, Ed Brass, asked this court for permission to withdraw from the case. The court granted the request on June 6 and temporarily remanded the case to allow for the appointment of substitute counsel. On August 27, the district court appointed new counsel, James Slavens, to represent Archuleta. On July 17, 2009, while Archuleta's appeal to this court was still pending, Archuleta, aided by new counsel, filed a motion in the habeas court for a new trial and a motion to set aside the habeas court's order denying habeas corpus relief on Archuleta's post-conviction claims. The motions were made pursuant to rules 59 and 60(b) of the Utah Rules of Civil Procedure. The district court held oral arguments on Archuleta's rule 59 and rule 60(b) motions on January 20, 2010. On April 21, the court denied Archuleta's motions. Archuleta appeals that decision of the district court. We address this aspect of Archuleta's appeal in the portion of this opinion titled "Archuleta's Rule 60(b) Motion for Relief from Judgment."[1]

---

1. As a preliminary aside, we note a concern that was prompted by the briefing in this case—a concern that is all too common in cases like this one and that calls for an admonition of the lawyer involved and a warning for counsel going forward. The conduct of concern is the last-minute filing of a motion for leave to file an overlength brief. Such motions are especially problematic in cases like this one, where there are time sensitivities in the case or an order foreclosing any further extensions of time on briefing deadlines or both. In such circumstances, motions for overlength briefs filed on the eve of a deadline threaten to effect an automatic de facto extension either of the time for filing or of the length limit, since it will take some time for the court to rule on the motion for leave to file an overlength brief and a denial of such a motion may in fairness dictate some additional time to revise the brief.

Counsel for Archuleta, James Slavens, followed this pattern in the course of the parties' briefing in this court on appeal. Despite an order from this court precluding any further requests for extensions of filing deadlines, Slavens filed a motion for leave to file an overlength brief and to extend the deadline for the filing of his brief on January 24, 2011, the eve of the filing deadline for his brief (January 25). Slavens's combined

## ARCHULETA'S PETITION FOR A WRIT OF HABEAS CORPUS

¶ 18 A threshold question presented in this case is whether Archuleta's petition is governed by common law habeas rules or by the Utah Post–Conviction Remedies Act (the PCRA). Archuleta's position on this appeal is somewhat inconsistent. At times he argues for the application of common law standards, and at others he asserts that the PCRA applies. The issue is complicated by the fact that although the PCRA applies only to post-conviction proceedings filed after July 1, 1996, Archuleta's case includes both an initial petition filed before that date (March 10, 1994) and a second amended petition filed thereafter (June 14, 2002). We are thus faced with a question that the parties have raised but not fully briefed, which is whether the PCRA might apply to new claims raised for the first time in an amended petition filed after its effective date. The threshold question, in other words, is whether the relevant filing date of Archuleta's post-conviction proceeding is that of his first petition or that of the second amended petition adding new claims.

¶ 19 We need not reach that question, however, because, as demonstrated below, the

motion, moreover, not only contravened our scheduling order precluding any further motions for extensions of time, but also fell short under rule 24(h) of the Rules of Appellate Procedure because it failed to include a copy of the draft overlength brief. Such a blatant disregard of our scheduling order and of rule 24(h) is inexcusable, particularly as it seems designed to take advantage of the difficulty of the court's timely resolution of these motions.

We stop short of a formal reprimand here, but we will not regard such conduct lightly going forward. We recognize that in practice we have granted such motions somewhat liberally. Insofar as the circumstances suggest that counsel is fishing for a de facto time extension by contravening our rules, however, counsel should not assume that our liberality will continue. We expressly hold open the possibility of striking extraneous portions of over-length briefs, rejecting nonconforming briefs altogether, and entering sanctions against counsel who flout our orders and rules in the future. Counsel should be on notice of our diminishing patience with motions for overlength briefs, particularly when such motions are filed on the eve of a filing deadline in a time-sensitive matter.

habeas court's decisions can be (and are) affirmed under either common law habeas or PCRA standards. Thus, we decline to decide which regime governs in a case like this one where the original petition for a writ of habeas corpus was filed before passage of the PCRA but a subsequent amended petition was filed after the PCRA went into effect.

¶ 20 For purposes of this case, the common law and PCRA standards are substantially equivalent. A common law "petition for habeas corpus is a collateral attack of a conviction and/or sentence and is not a substitute for direct appellate review." *Carter v. Galetka*, 2001 UT 96, ¶ 6, 44 P.3d 626. "Habeas corpus is an extraordinary remedy; if the contention of error is known or should have been known to the petitioner at the time of judgment, it must be raised and appealed through the regular and prescribed procedure[.] [O]therwise[,] the regular rules of procedure governing appeals would be nullified." *Id.* ¶ 14. Thus, only under "unusual circumstances" should a court entertain for the first time a claim collaterally attacking a conviction or sentence in a habeas proceeding. *Id.* (internal quotation marks omitted).

¶ 21 "Unusual circumstances" arise "where an obvious injustice or a substantial and prejudicial denial of a constitutional right has occurred, irrespective of whether an appeal has been taken." *Hurst v. Cook*, 777 P.2d 1029, 1035 (Utah 1989). "[T]he unusual circumstances test was intended to assure fundamental fairness and to require reexamination of a conviction on habeas corpus when the nature of the alleged error was such that it would be unconscionable not to reexamine, and thereby to assure that substantial justice was done." *Id.* (alterations omitted) (internal quotation marks omitted).

¶ 22 One well-established "unusual circumstance" arises when "allegedly incompetent counsel handled the trial and the direct appeal." *Fernandez v. Cook*, 783 P.2d 547, 549 (Utah 1989). Under such a circumstance, "an ineffective assistance of counsel claim can properly be raised for the first time via habeas corpus." *Id.* This is because "it is unreasonable to expect [an] attorney to raise the issue of his own incompetence," and the habeas corpus petition may be "the first

and only means" for a defendant to raise challenges to his conviction. *Id.*

¶ 23 The PCRA contains a similar provision. Under the PCRA, "a person who has been convicted and sentenced for a criminal offense may file an action in the district court of original jurisdiction for post-conviction relief to vacate or modify the conviction or sentence" if "the petitioner had ineffective assistance of counsel in violation of the United States Constitution or Utah Constitution." UTAH CODE ANN. § 78B–9–104(1)(d) (Supp.2011).

¶ 24 In his habeas corpus petition, Archuleta raised thirty substantive challenges to his conviction and sentence. He also raised numerous ineffective assistance of counsel claims asserting that trial and appellate counsel rendered ineffective assistance by failing to raise at trial and on appeal each of Archuleta's thirty substantive claims. The habeas court interpreted *Archuleta II* to have revived only Archuleta's ineffective assistance of counsel claims. With respect to those claims, moreover, the court found that Archuleta could not demonstrate that counsel did indeed render ineffective assistance under the United States Supreme Court case of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

¶ 25 "We review an appeal from an order dismissing or denying a petition for post-conviction relief for correctness without deference to the lower court's conclusions of law." *Taylor v. State*, 2007 UT 12, ¶ 13, 156 P.3d 739 (internal quotation marks omitted). Moreover, "[w]hen confronted with ineffective assistance of counsel claims, we review a lower court's purely factual findings for clear error, but [we] review the application of the law to the facts for correctness." *Id.* For the reasons articulated below, we affirm the decisions of the habeas court.

## I. CLAIMS PROCEDURALLY BARRED

¶ 26 In his second amended petition for habeas corpus, Archuleta raised forty-three claims, many with numerous subparts. The first thirty of those claims concerned issues that could have been, but were not,

raised at trial or on appeal. Archuleta had raised all thirty of those claims in his first amended petition filed on August 11, 1994. Conceding that he did not raise these issues in his direct appeal, Archuleta argues that unusual circumstances justify our entertaining them now. Archuleta's substantive claims are the following: (1) The trial court's "death-qualification" of the jury ensured a jury that is more likely than not to convict and impose the death penalty. (2) The trial court erroneously removed for cause a juror whose views on the death penalty were not strong. (3) The trial court erroneously failed to grant Archuleta's challenge for cause of a juror who had demonstrated bias that impaired his ability to judge impartially. (4) The trial court erroneously failed to change venue of the trial. (5) The trial court should have excluded incriminating statements by Archuleta pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (6) The trial court erroneously and prejudicially allowed testimony that Archuleta admitted to engaging in a sex act with Church. (7) The trial court committed error in admitting the autopsy report and allowing the jury access to the report during jury deliberations. (8) The trial court failed to clarify the jury instructions in response to a question from the jury. (9) The trial court provided an improper reasonable doubt instruction. (10) The prosecution committed misconduct in closing arguments during the guilt and sentencing phase of the trial. (11) The trial court erroneously failed to conduct hearings to determine juror misconduct during the penalty phase when it learned that a juror had been contacted about the case. (12) The trial court erroneously allowed the state to produce jailhouse informant testimony.[2] (13) The trial court erroneously allowed the jury to hear evidence regarding the victim's character and victim impact evidence. (14) The trial court failed to instruct the sentencing jury that aggravating circumstances had to be established beyond a reasonable doubt. (15) The trial court failed to give an instruction on "residual doubt" during the penalty phase. (16) The trial court improperly defined statutory mitigating circumstances in its instructions to the jury. (17) The trial court provided inadequate instructions in defining and considering mitigating evidence. (18) The trial court improperly incorporated all of the guilt-phase instructions, including the voluntary intoxication instruction, at the penalty phase. (19) The trial court improperly allowed the jury to double count aggravating circumstances. (20) The trial court failed to address Archuleta's competency to stand trial under a proper procedure. (21) Archuleta was improperly forcibly medicated at trial. (22) The death sentence was imposed and affirmed on appeal without a finding of facts in compliance with *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).(23) The state did not establish that Church was conscious throughout the totality of the assault, thus failing to establish that the murder was "especially heinous." (24) "Heinous, atrocious, or cruel" as aggravating factors are unconstitutionally vague and overbroad as applied to acts committed after the victim has lost consciousness. (25) The Utah death penalty scheme improperly allows for consideration of non-statutory aggravating factors. (26) The Utah death penalty scheme improperly creates a presumption of death. (27) The Utah death penalty scheme improperly allows consideration at the penalty phase of

---

2. This claim regards testimony during the sentencing phase of the trial by David Homer, Archuleta's cellmate shortly after Archuleta was arrested for Church's murder. Homer testified that Archuleta bragged to him that killing Church "was the ultimate rush, that there was— that you couldn't get any kind of high from any kind of drugs from it all. [Archuleta] said that the evil had completely taken over him. And that once he started, they couldn't stop." In addition to attacking the admission of Homer's testimony at trial, Archuleta now argues that newly discovered evidence demonstrates that Homer's testimony was untrue. Accordingly, Archuleta argues that his death sentence should be vacated. Specifically, Archuleta presented to the habeas court affidavits from various individuals stating that Homer had recanted his testimony. The habeas court struck those affidavits, however, because they were hearsay. Archuleta has not articulated an exception to the exclusionary rule that would allow the affidavits to be presented, and we accordingly affirm the habeas court's rejection of Archuleta's newly discovered evidence claim regarding Homer's testimony.

"any evidence deemed to have probative force." (28) The Utah death penalty scheme does not allow for genuine narrowing of the class of murderers eligible for the death penalty. (29) The trial court failed to ensure Archuleta's presence at all proceedings. (30) The trial court failed to ensure a complete appellate record.

¶ 27 After the filing of the first amended petition, Respondent filed a motion to dismiss and a motion for summary judgment. On October 4, 1996, Judge Lynn W. Davis, who was then assigned to Archuleta's case, granted Respondent's motions and rejected all of Archuleta's claims. Archuleta appealed Judge Davis's ruling to the Utah Supreme Court.

¶ 28 In a short opinion, this court reversed on June 26, 1998. The court asserted that Archuleta's first amended petition for a writ of habeas corpus "challeng[ed] his conviction on the ground that he had been denied his Sixth Amendment constitutional right to the effective assistance of counsel both at the trial of his case and on the appeal of the conviction." *Archuleta II*, 960 P.2d 399 (Utah 1998). The court noted that Judge Davis had "dismissed the petition on the ground that the claims asserted by Archuleta were procedurally barred because they could have been raised on direct appeal and were not." *Id.* The court therefore concluded that the "district court erred in ruling that the petition for a writ of habeas corpus, which was based on the allegation of ineffective assistance of counsel at trial and on appeal, was barred." *Id.* The *Archuleta II* court made no reference to Archuleta's substantive (i.e., non-ineffective assistance of counsel) claims that comprise his first thirty claims in the present appeal.

¶ 29 The habeas court interpreted *Archuleta II* to revive only Archuleta's ineffective assistance of counsel claims and to foreclose all of Archuleta's other claims which could have been but were not raised at trial or on appeal. The court considered the *Archuleta II* court's silence on the substantive claims to mean that Judge Davis's holding dismissing those claims was final. The court cited for this proposition our holding in *State v. Carter* that an appellate court "need not analyze and address in writing each and every argument issue, or claim raised and properly before [it] on appeal." 776 P.2d 886, 888 (Utah 1989) (overruled on other grounds). Thus, according to the habeas court, "with the exception of [Archuleta's] ineffective assistance of counsel claim[s], the [Utah Supreme] Court left undisturbed Judge Davis's ruling that the other claims in the first amended petition were procedurally barred."

¶ 30 Archuleta contends that this holding was incorrect and that *Archuleta II* revived all of his claims, even those not based on a theory of ineffective assistance of counsel. First, Archuleta claims error because the habeas court never examined any of his first thirty claims to determine whether any of them presented "unusual circumstances" that would exempt them from the procedural bar. But whether the habeas court examined Archuleta's substantive claims for unusual circumstances is not the question, for presumably Judge Davis did so (at least Archuleta has not indicated otherwise). Put differently, if the habeas court was correct that *Archuleta II* affirmed Judge Davis's dismissal of Archuleta's non-ineffective assistance of counsel claims, then there is no need to pass through them a second time, and it is irrelevant that the habeas court did not do so.

¶ 31 Second, Archuleta contends that by merely raising ineffective assistance of counsel claims that were premised on counsel's failure to raise the substantive claims contained in claims one through thirty, he thereby revived the substantive claims. As support for this creative argument, Archuleta cites a provision of the PCRA that states that "a person may be eligible for relief on a basis that the ground could have been but was not raised at trial or on appeal, if the failure to raise that ground was due to ineffective assistance of counsel." UTAH CODE ANN. § 78–35A–106(2) (since renumbered as § 78B–9–106(3) (Supp. 2011)).

¶ 32 Archuleta is simply wrong to assert that by raising an ineffective assistance of counsel claim he thereby revives the underlying substantive claim upon which the ineffective assistance claim was premised. The cited statute clearly allows an otherwise procedurally barred airing of a substantive

claim when it wasn't raised because of ineffective assistance of counsel. But there must first be a showing of ineffective assistance of counsel. The mere allegation of ineffective assistance is not enough alone to revive the substantive claim. *See Fernandez v. Cook*, 783 P.2d 547, 550 (Utah 1989) (declining to consider claim of jury bias on habeas review, but allowing claim of ineffective assistance of counsel for failing to raise jury bias claim). And as we detail at length below, Archuleta has not shown ineffective assistance of counsel relating to any of substantive claims one through thirty.

¶ 33 Ultimately, Archuleta has not persuasively combated the habeas court's conclusion that *Archuleta II* forecloses further airing of Archuleta's substantive claims. In *Carter v. Galetka*, 2001 UT 96, 44 P.3d 626, we reiterated that "this court reviews and decides each of the allegations of error raised in a death penalty case." *Id.* ¶ 5. That said, we "need not analyze and address in writing each and every argument, issue, or claim raised." *Id.* (internal quotation marks omitted).

> [I]f an issue raised depends upon essential principles that have already been established, we may well omit discussion of that issue. Use of this rule in capital punishment cases continues to be appropriate and important in enabling this Court, after fair and comprehensive review, to expeditiously focus judicial resources and energy on those critical or outcome-determinative issues.

*Id.* (alterations and internal quotation marks omitted).

¶ 34 This is what happened in *Archuleta II*. There, we reversed Judge Davis's dismissal of Archuleta's claims in part—only with respect to Archuleta's ineffective assistance of counsel claims. We did not reverse Judge Davis's dismissal of Archuleta's substantive claims, even though we did not analyze them in a written opinion. Accordingly, the habeas court was correct to dismiss those claims as procedurally barred.[3] Archuleta has failed to demonstrate that any of the exceptions enumerated above apply in this case. We therefore conclude that because the first thirty claims raised in Archuleta's second amended petition duplicate claims Judge Davis rejected as procedurally barred, these thirty claims remain procedurally barred.[4] The habeas court, therefore, correctly concluded that Respondent is entitled to summary judgment on these thirty claims.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

¶ 35 As noted above, absent "unusual circumstances," a "party may not raise issues in a habeas corpus petition that could or should have been raised on direct appeal." *Fernandez v. Cook*, 783 P.2d 547, 549 (Utah 1989). One such "unusual circumstance" exists "when trial counsel represented the defendant on direct appeal and the defendant in a subsequent habeas proceeding contends that he had ineffective assistance of counsel at trial, on appeal, or both." *Parsons v. Barnes*, 871 P.2d 516, 521 (Utah 1994). This rule is grounded in the rationale "that trial counsel cannot reasonably be expected to

---

**3.** *See Gildea v. Guardian Title Co. of Utah*, 2001 UT 75, ¶ 10, 31 P.3d 543 ("[W]hen a legal 'decision [is] made on an issue during one stage of a case,' that decision 'is binding in successive stages of the same litigation.'" *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 67, 82 P.3d 1076 (quoting *Thurston v. Box Elder Cnty.*, 892 P.2d 1034, 1037 (Utah 1995))); *AMS Salt Indus. v. Magnesium Corp. of Am.*, 942 P.2d 315, 319 (Utah 1997) ("One branch of the doctrine stands for the general rule that 'one district court judge cannot overrule another district court judge of equal authority.'" (quoting *Mascaro v. Davis*, 741 P.2d 938, 946 (Utah 1987))).

**4.** The habeas court also concluded that two of Archuleta's thirty substantive claims raised in the second amended petition were claims that had

been raised and rejected on direct appeal. *See Archuleta I*, 850 P.2d at 1238–40, 1241–42 (rejecting claim that statements by Archuleta were not made pursuant to a knowing and voluntary waiver and rejecting claim that Archuleta was prejudiced by presentation at trial of his admission that he engaged in a sex act with Church). The habeas court therefore rejected those claims on the alternative ground that "[i]ssues raised and disposed of on direct appeal of a conviction or a sentence cannot properly be raised again in a [petition for post-conviction relief] and should be dismissed as an abuse of the writ without a ruling on the merits." *Gardner v. Holden*, 888 P.2d 608, 613 (Utah 1994) (citation omitted). This ruling of the habeas court was correct.

raise the issue of his or her own incompetence on appeal." *Id.* Archuleta was represented by the same counsel at trial and on appeal, and his claims of ineffective assistance are accordingly properly before us. *See Archuleta II,* 960 P.2d at 399 (Utah 1998) ("The district court erred in ruling that the petition for a writ of habeas corpus, which was based on the allegation of ineffective assistance of counsel at trial and on appeal, was barred.").

¶ 36 Archuleta asserted dozens of counts of ineffective assistance of counsel in the habeas court. The habeas court dismissed several of those claims on summary judgment either because Archuleta chose not to oppose summary judgment on them or because having rejected Archuleta's proffer of evidence on those claims as barred by the rules of evidence, the court deemed summary judgment to be unopposed. Archuleta contends that this sweeping dismissal of many of his claims was error. The habeas court also examined several of the claims for which Archuleta opposed summary judgment. The court granted Respondent summary judgment on all but one class of those claims based on the United States Supreme Court's holding in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). After hearing evidence on the one remaining class of claims, the habeas court dismissed those claims for failure to satisfy *Strickland.*

¶ 37 Archuleta appeals the decision of the habeas court on eleven claims. He contends that his counsel: (1) failed to object to and raise on appeal improper closing arguments made by the prosecution; (2) failed to object to and raise on appeal inadequate supplemental jury instructions regarding object rape; (3) failed to object to or raise on appeal penalty phase jury instructions that improperly created the presumption that death was the appropriate penalty; (4) failed to argue at trial or on appeal that Utah's death penalty scheme does not adequately narrow the class of death-eligible murders and does not appropriately channel the capital sentencer's discretion; (5) failed to argue at trial or on appeal that the "especially heinous" aggravating circumstance is unconstitutional as applied to acts committed after the victim has lost consciousness; (6) failed to object to or raise on appeal the admission of the autopsy report; (7) failed to object to and raise on appeal the trial court's reasonable doubt jury instruction; (8) failed to object to and raise on appeal the trial court's failure to provide a jury instruction regarding the burden of proof as to the existence of aggravating circumstances; (9) failed to object to and raise on appeal the trial court's application of the guilt phase jury instructions to the penalty phase; (10) failed to object to and raise on appeal the trial court's double counting of aggravating circumstances; and (11) inadequately investigated and presented mitigating evidence at the sentencing phase of the trial and failed to raise this issue on appeal.

¶ 38 In *Strickland,* the United States Supreme Court established a two-part test for determining whether a criminal defendant's right to the effective assistance of counsel has been violated. We restated that test as follows: "To prevail, a defendant must show, first, that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment and, second, that counsel's performance prejudiced the defendant." *Bundy v. Deland,* 763 P.2d 803, 805 (Utah 1988). We have applied this test in several cases. *See, e.g., State v. Templin,* 805 P.2d 182, 186–87 (Utah 1990); *State v. Carter,* 776 P.2d 886, 893 (Utah 1989) (overruled on other grounds); *State v. Frame,* 723 P.2d 401, 405 (Utah 1986).

¶ 39 In evaluating counsel's performance under the first *Strickland* prong, we recognize " 'the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant.' " *Templin,* 805 P.2d at 186 (alteration in original) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Accordingly, a defendant seeking to establish ineffective assistance of counsel must "overcome the strong presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment." *State v. Bullock,* 791 P.2d 155, 159–60 (Utah 1989).

¶ 40 To establish prejudice under *Strickland*'s second prong, a defendant must present sufficient evidence to support "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Templin*, 805 P.2d at 187; *Carter*, 776 P.2d at 893–894. In cases where the defendant challenges a sentence of death, "the question is whether there is a reasonable probability that absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. "Reasonable probability means a probability sufficient to undermine confidence in the reliability of the sentence." *Parsons*, 871 P.2d at 522.

¶ 41 The two-step *Strickland* test is moored in the purpose of the Sixth Amendment right to counsel—"to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052. As the United States Supreme Court has explained,

> [T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the

Sixth Amendment guaranty is generally not implicated.

*United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Accordingly, unless a defendant satisfies both prongs of *Strickland* (deficient conduct of counsel *and* prejudice), "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. We therefore "require[ ] defendants claiming ineffective assistance of counsel to affirmatively prove both prongs of the *Strickland* test to prevail." *Parsons*, 871 P.2d at 522. As a result, "it is not necessary for us 'to address both components of the inquiry' " if we determine that a defendant has made " 'an insufficient showing on one.' " *Id.* at 523 (quoting *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052). In the event it is "easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," we will do so without analyzing whether counsel's performance was professionally unreasonable. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.[5]

¶ 42 Finally, only one class of Archuleta's ineffective assistance of counsel claims survived summary judgment. All others were dismissed, either because Archuleta chose not to oppose summary judgment on certain claims, or because Archuleta had failed to present a genuine issue of material fact on

---

5. The habeas court referred to past statements of this court that in judging the effectiveness of appellate counsel a court is to apply the so-called "dead-bang winner" standard. But as Archuleta correctly points out in his briefs, "the omission of a 'dead-bang winner' argument" is a "circumstance that would warrant a finding of ineffective assistance of appellate counsel"; it is not "the standard for relief," but rather "an example of a circumstance when relief would be warranted." *Lafferty v. State*, 2007 UT 73, ¶ 39 n. 2, 175 P.3d 530. In articulating a "dead-bang winner" standard, however, the habeas court did not "overstate the petitioner's burden," *id.*, as Archuleta claims. Instead, the court tracked recent modifications of the "dead-bang winner" test by the United States Court of Appeals for the Tenth Circuit. That court recently held that

> [t]o the extent [the "dead-bang winner"] language can be read as requiring the defendant to establish that the omitted claim would have resulted in his obtaining relief on appeal, rather than there being only a reasonable probabil-

ity the omitted claim would have resulted in relief, this language conflicts with *Strickland*. The en banc court, therefore, expressly disavows the use of the "dead-bang winner" language to imply requiring a showing more onerous than a reasonable probability that the omitted claim would have resulted in a reversal on appeal.

*Neill v. Gibson*, 278 F.3d 1044, 1057 n. 5 (10th Cir.2001) (citations omitted). Thus, the habeas court concluded that use of the phrase "dead-bang winner" was moored in and identical to the standard enunciated in *Strickland:* that with respect to each prong of *Strickland* a habeas petitioner arguing ineffective assistance of counsel for failure to raise a claim on appeal must demonstrate (1) that appellate counsel failed to raise an issue which was obvious from the trial record and (2) that the issue is one which probably would have resulted in reversal on appeal. Because its analysis was anchored in *Strickland*, we find no prejudice in the habeas court's use of the phrase "dead-bang winner."

one or both of the *Strickland* components. In order to avoid summary judgment on claims of ineffective assistance of counsel, Archuleta must demonstrate that there is a genuine issue of material fact with respect to each prong of the *Strickland* test. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." UTAH R. CIV. P. 56(c).

¶ 43 Any showing in support of summary judgment "must preclude all reasonable possibility that the loser could, if given a trial, produce evidence which would reasonably sustain a judgment in his favor." *Bullock v. Deseret Dodge Truck Ctr., Inc.*, 11 Utah 2d 1, 354 P.2d 559, 561 (1960). "Only when it so appears, is the court justified in refusing such a party the opportunity of presenting his evidence and attempting to persuade the fact trier to his views." *Holbrook Co. v. Adams*, 542 P.2d 191, 193 (Utah 1975). However, if the party moving for summary judgment satisfies his burden of "informing the trial court of the basis for the motion and identifying the portions of the pleadings or supporting documents which [he] believes demonstrates an absence of a genuine issue of material fact," *TS 1 P'ship v. Allred*, 877 P.2d 156, 158 (Utah Ct.App.1994), then the opposing party cannot simply "rest upon the mere allegations or denials of his pleading, but his response … must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." *See id.; see also* UTAH R. CIV. P. 56(e).

¶ 44 In the subsections that follow, we examine first whether the habeas court correctly dismissed on summary judgment the group of ineffective assistance of counsel claims for which Archuleta did not adequately oppose summary judgment. We next examine each claim that the habeas court examined and dismissed individually. Finally, we review the one claim that did survive summary judgment and that was rejected on its merits.

### A. Claims for Which the Habeas Court Deemed Archuleta Not to Have Properly Opposed Summary Judgment

¶ 45 The habeas court summarily dismissed several of Archuleta's ineffective assistance of counsel claims because he did not properly oppose Respondent's motion for summary judgment on those claims. For some of the claims, Archuleta failed entirely to oppose summary judgment. On others, he opposed summary judgment by submitting affidavits that the habeas court disallowed for various reasons, including that they consisted of inadmissible hearsay evidence. Pursuant to rule 56(e) of the Utah Rules of Civil Procedure, the habeas court dismissed these claims for inadequately opposing summary judgment.

¶ 46 Archuleta claims error, asserting that rule 56 of the Utah Rules of Civil Procedure does not apply in this case, and that he accordingly was not required to set forth any specific facts showing that there was a genuine issue for trial on any of his claims. All he had to do, under this view, was to baldly assert an ineffective assistance claim and the district court would have to conduct hearings on those claims. He also alleges that he may "rais[e] novel claims or theories of recovery in a memorandum in opposition to a motion to dismiss or for summary judgment." (quoting *Lafferty*, 2007 UT 73, ¶ 47 n. 5, 175 P.3d 530).

¶ 47 Archuleta purports to ground these standards in rule 65C, which "governs proceedings in all petitions for post-conviction relief filed under the [PCRA]." UTAH R. CIV. P. 65C(a). As Archuleta indicates, that rule provides that a "court shall not review for summary dismissal the initial post-conviction petition in a case where the petitioner is sentenced to death." *Id.* 65C(h)(4). According to Archuleta, this language demonstrates that the habeas court committed error when it dismissed his claims on summary judgment, and he should be allowed a hearing regarding each of his asserted claims.

¶ 48 This argument fails whether Archuleta's petition is governed by common law habeas corpus rules or by the PCRA. *See*

*supra* ¶¶ 20–23. First, rule 65C does not apply to common law habeas corpus cases. Archuleta's claims would be governed instead by rule 65B, *see* Utah R. Civ. P. 65B(b) ("Except for instances governed by Rule 65C, this paragraph shall govern all petitions claiming that a person has been wrongfully restrained of personal liberty, and the court may grant relief appropriate under this paragraph."), which expressly states that "[n]othing" in the rule "shall be construed to prohibit the court from ruling upon the [habeas corpus] petition based upon a dispositive motion." *Id.* 65B(b)(6). Under rule 65B, a district court would be justified in invoking rule 56 in deciding whether to grant summary judgment. And rule 56(e) allows a district court to grant a motion for summary judgment on claims that are not adequately opposed. *See id.* 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the pleadings, but the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. Summary judgment, if appropriate, shall be entered against a party failing to file such a response.").

¶ 49 Second, even if the PCRA were to apply to Archuleta's appeal, his argument that a district court may never render summary judgment in a death penalty case is simply wrong. To be sure, rule 65C applies to petitions for post-conviction relief governed by the PCRA. *See id.* 65C(a) ("This rule governs proceedings in all petitions for post-conviction relief filed under the [PCRA]."). And rule 65C(h)(4) prohibits a district court from "review[ing] for summary dismissal the initial post-conviction petition in a case where the petitioner is sentenced to death." But in referring to "summary dismissal" rule 65C speaks not of the sort of "summary judgment" rendered by the habeas court in this case, but of an earlier screening mechanism that allows judges to weed out frivolous post-conviction claims that have a low likelihood of success. Rule 65C(h)(1) gives broader context to a judge's authority to summarily dismiss certain post-conviction claims.

The assigned judge shall review the petition, and, if it is apparent to the court that any claim has been adjudicated in a prior proceeding, or if any claim in the petition appears frivolous on its face, the court shall forthwith issue an order dismissing the claim, stating either that the claim has been adjudicated or that the claim is frivolous on its face.

*Id.* 65C(h)(1). Nothing in rule 65C prevents a district court from ruling on a dispositive summary judgment motion, however, provided that the nonmoving party is given the *chance* to respond. In fact, courts rule on summary judgment motions in PCRA cases all the time. *See Gardner v. State*, 2010 UT 46, ¶ 57, 234 P.3d 1115; *Kell v. State*, 2008 UT 62, ¶ 1, 194 P.3d 913; *Lafferty*, 2007 UT 73, ¶ 23, 175 P.3d 530. The habeas court justifiably followed this well-established pattern.

### B. Ineffective Assistance of Counsel Claims Considered by the Habeas Court

¶ 50 Archuleta appeals the habeas court's individual rejection of several of his ineffective assistance of counsel claims. For the reasons provided below, we affirm each of the habeas court's challenged holdings.

### 1

¶ 51 In closing arguments before the sentencing jury, the prosecution depicted Archuleta as a "callous killer who lit up a cigarette after realizing that Mr. Church was dead," as a "cold indifferent killer who thought of Mr. Church as nothing more than a dead rabbit and [who] was deliberate, calculating and methodical" and as a person who, after the killing, returned home to have sex with his girlfriend. Archuleta contends that these statements were inappropriate and prejudicial under this court's decision in *State v. Bolsinger*, 699 P.2d 1214 (Utah 1985), and that his counsel should have objected to them. He also argues that his appellate counsel should have sought reversal on this basis.

¶ 52 The habeas court granted summary judgment on this claim because Ar-

chuleta proffered nothing in support of his burden to establish *Strickland* prejudice. Archuleta has shown no error in that ruling. The sum of his prejudice argument is that "[p]rosecutorial misconduct occurred, together with the accompanying reasonable likelihood of prejudicing and influencing the jury." Merely repeating the legal prejudice standard is insufficient. *See Fernandez*, 870 P.2d at 877. Archuleta does nothing else. We affirm on that basis. *See Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

### 2

¶ 53 During the guilt phase, the jury asked the following question concerning object rape: "Can participation in previous sexual acts which could have incited Wood to commit object rape be legally considered encouragement?" The court answered: "This is for you to determine as fact finders. You have instructions that can assist you." Archuleta contends that "the trial court committed constitutional error by failing to adequately address the jury's question asked during jury deliberation," and that Archuleta's "attorney provided ineffective assistance of counsel for failing to present this claim on appeal."

¶ 54 The habeas court rejected this claim because Archuleta did not "demonstrate[ ] that a genuine issue of material facts" existed concerning prejudice. Archuleta put forth only a terse statement that it "remains to be seen after an evidentiary hearing is held in this case whether the 'different outcome' prong will be satisfied." The court found this statement to be insufficient to find that Archuleta had "demonstrated that a genuine issue exists on whether there is a reasonable probability of a different outcome as a result of trial counsel's failure to object or that, had the issue of trial counsel's failure been raised

by appellate counsel, it probably would have resulted in reversal on appeal."

¶ 55 We agree with the habeas court's conclusion. A petitioner "must submit more than just conclusory assertions that an issue of material fact exists to establish a genuine issue." *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 31, 54 P.3d 1054. In his briefs on this appeal, Archuleta adds nothing further to this claim, arguing opaquely that "the direct appeal did not resolve how [this] issue impacts the question of effective assistance of counsel or the question of how that issue interacts with the other issues raised by the petition to undermine confidence in the guilty verdict, penalty verdict, or both." "With these issues in doubt and unaddressed," Archuleta continues, "summary judgment was inappropriate." Such general assertions of prejudice are insufficient to survive summary judgment. We accordingly affirm the habeas court's dismissal of this issue.

### 3

¶ 56 Archuleta contends that the penalty phase jury instructions "improperly created a presumption that death was the appropriate penalty," because they insufficiently emphasized the second *Wood* element—that a death sentence must be "justified and appropriate," *State v. Wood*, 648 P.2d 71, 83 (Utah 1982) (internal quotation marks omitted)—and that his trial and appellate counsel rendered ineffective assistance for failing to raise this claim at trial or on appeal. The habeas court refused to reach this claim because Archuleta first raised it in opposition to summary judgment.

¶ 57 Archuleta's claim is without merit. In *Wood*, this court established "the appropriate standard to be followed by the sentencing authority . . . in a capital case":

After considering the totality of the aggravating and mitigating circumstances, [1] you must be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation, and [2] you must further be persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and appropriate in the circumstances.

*Id.* (internal quotation marks omitted). Because the penalty phase instruction in this case substantially tracked this language from *Wood,* and because we have not since disavowed this aspect of *Wood,* it is still good law and trial counsel's failure to object was not ineffective.

¶ 58 In so holding, we reject Archuleta's assertion that our decision in *State v. Holland,* 777 P.2d 1019 (Utah 1989), somehow superseded *Wood.* In that case, this court vacated a death sentence because the trial court failed entirely to apply the second *Wood* element. *See id.* at 1027 ("[T]he judge did not decide whether, based on all the circumstances, the death penalty was justified and appropriate beyond a reasonable doubt."). The *Holland* court described the purpose of the second *Wood* step as "to determine whether the death penalty is appropriate under all the circumstances of the case and in light of the circumstances of the defendant's background and life as a whole." *Id.* The court then explained why that failure was important.

> [T]he Eighth Amendment to the United States Constitution does not permit the death penalty to be imposed for every intentional homicide. To avoid having the first part of the *Wood* test produce an unduly broad application of the ultimate sanction, *Wood* also requires the sentencing authority to take a long, hard second look at the totality of the circumstances in light of societal values and the high value that this state and the Eighth Amendment place on the value of all human life and the humanity of every human being, no matter how depraved he or she may have become or how far he or she may have fallen from the norms of a civilized society. It is in applying the second part of the test that the sentencing authority may rely on leniency to refuse to impose the death penalty, even in the face of overwhelming aggravating evidence. After considering all aspects of the case, in addition to the particular aggravating and mitigating circumstances relied on by the State and the defendant, the sentencing authority must be persuaded beyond a reasonable doubt that the imposition of the death penalty is justified and appropriate in the circum-

stances. Thus, the sentencing authority may refuse to impose the death penalty even though it concedes that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

*Id.* at 1028 (alterations omitted) (internal quotation marks omitted). Archuleta argues that this language—especially the statement that the jury must examine the appropriateness of the death penalty "in light of the circumstances of the defendant's background and life as a whole." *id.* at 1027—should have been included in the jury instruction and that its omission violated *Holland.* We disagree. *Holland* did not displace *Wood.* It merely provided context for why including the second *Wood* step is so crucial. Because the trial court included both *Wood* steps in its jury instruction, we uphold the determination of the habeas court rejecting this claim.

### 4

¶ 59 Archuleta contends that his trial counsel was ineffective because he "failed to object and argue to the trial court that the Utah Death Penalty Scheme as contained in [Utah Code section] 76–5–202(1) does not narrow the class of persons eligible for the death penalty and to channel the sentencer's discretion." He also contends that appellate counsel was ineffective because he failed to raise this issue on appeal. According to Archuleta, Utah's death penalty scheme fails to narrow the class of death-eligible murders or properly channel the sentencing authority's discretion because (1) "by stating so many broad categories of capital murder[,] ... virtually all intentional murders qualify as aggravated," and (2) the standard set forth in *Wood,* and adopted by the legislature, "fails to give ... jurors adequate guidance in the imposition of the death penalty[ ] and permits so much juror subjectivity to enter into the decision as to virtually guarantee arbitrary results."

¶ 60 The claim that Utah's death penalty scheme fails to narrow the class of murders eligible for the death penalty is not a new one. This court has entertained and rejected that claim on multiple occasions. In *State v. Arguelles,* we rejected a similar claim, stating that "[w]e have addressed challenges to

Utah's ... death penalty scheme and found [it] to be constitutional." 2003 UT 1, ¶ 127, 63 P.3d 731.[6]

¶ 61 Noting the numerous cases from this court rejecting claims identical to Archuleta's, the habeas court held that "trial counsel's decision not to raise them at trial was not unreasonable under prevailing professional norms." We agree and see no need to proceed to the second component of *Strickland.* Given our repeated rejection of this claim, Archuleta's trial and appellate counsel did not provide ineffective assistance of counsel for electing not to bring a claim that had little or no chance of gaining any traction.

5

■■■ ¶ 62 Archuleta next contends that one of the four aggravating circumstances found by the sentencing jury is vague and overbroad on its face and does "not adequately channel the jury's discretion and protect against the arbitrary application of the death penalty." Specifically, Archuleta asserts that the "especially heinous" aggravating circumstance set forth in Utah Code section 76-5-202(1)(q) requires the victim to endure pain and suffering beyond that which is necessary to simply cause the victim's death. This aggravating circumstance is therefore unconstitutional, Archuleta argues, when applied to acts committed after a victim has lost consciousness. Because there was no showing at trial that Church was conscious during the entirety of the brutal assault, especially the violent object rape, Archuleta maintains that there was no showing that the heinous assault on Church caused him to endure additional pain and suffering, and it would therefore be unconstitutional for the "especially heinous" aggravating circumstance to apply to Archuleta's case.

¶ 63 In granting summary judgment to Respondent on this issue, the habeas court observed that the question "[w]hether the 'especially heinous' aggravating circumstance requires that the victim have a conscious awareness of pain during the lethal attack has not been expressly answered by the Utah Supreme Court." It also noted that various state jurisdictions are split on the question—some requiring the victim to consciously experience additional pain above and beyond that generally required to produce death,[7] and others holding that consciousness during a lethal attack is not required.[8] Reasoning

---

6. *See also State v. Kell,* 2002 UT 106, ¶¶ 58–59, 61 P.3d 1019 (rejecting claim that "Utah's death penalty statutes are unconstitutional because they do not narrow the class of death-eligible murders"); *State v. Honie,* 2002 UT 4, ¶ 27, 57 P.3d 977 (rejecting claim that Utah's death penalty scheme fails to channel sentencing discretion); *State v. Lovell,* 1999 UT 40, ¶ 38, 984 P.2d 382 (rejecting claim that "the Utah death penalty statute insufficiently narrows the class of persons eligible for the death penalty"); *State v. Young,* 853 P.2d 327, 337–38 (Utah 1993) (rejecting claims that "the extensive list of aggravating factors in [Utah Code] section 76-5-202 fails to narrow the class of offenders eligible for the death penalty"); *Holland,* 777 P.2d at 1024 (citing numerous older cases that rejected claims that the Utah death penalty scheme is unconstitutional "because it allows either too much discretion or unguided discretion in the imposition of the death penalty").

7. *See, e.g., Cheney v. State,* 909 P.2d 74, 80 (Okla. Crim.App.1995) ("Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." (internal quotation marks omitted)); *see also State v. Amaya–Ruiz,* 166 Ariz. 152, 800 P.2d 1260, 1285 (1990) ("A finding of cruelty requires that the victim be conscious at the time of the offense in order to suffer pain and distress. When evidence of consciousness is inconclusive, a finding of cruelty is unsupported."); *State v. Hunt,* 220 Neb. 707, 371 N.W.2d 708, 721 (1985) (holding that a murder was not "especially heinous, atrocious, cruel," and did not "manifest[ ] exceptional depravity by ordinary standards of morality and intelligence" when the victim was rendered unconscious within a short time of defendant's intrusion into the victim's home) (internal quotation marks omitted); *State v. Perry,* 124 N.J. 128, 590 A.2d 624, 646 (1991) ("[T]he torture and aggravated-assault basis for the death penalty cannot apply where no pain was suffered despite the murderer's intent to inflict it, because there would be too many possible presentations by the prosecution, each conceivably turning on theoretical reconstructions of intent." (internal quotation marks omitted)); *State v. Williams,* 690 S.W.2d 517, 529 (Tenn. 1985) ("'Torture' means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious.").

8. *See, e.g., People v. Wiley,* 18 Cal.3d 162, 133 Cal.Rptr. 135, 554 P.2d 881, 887 (1976) ("Attempts to measure the amount of pain, if any, suffered by victims of torturous acts, some of whom like [the victim], may have been rendered insensitive to pain by alcohol or drugs, others of

from the language of the statute in question and the judicial glosses placed on the statute by this court, the habeas court sided with those courts that do not require conscious suffering to trigger the "especially heinous" aggravating circumstance. The court accordingly held that trial and appellate counsel did not render ineffective assistance for failing to raise this claim. We affirm.

¶ 64 At the time of Archuleta's trial, an intentional homicide was classified as a capital offense if it was committed "in an especially heinous, atrocious, cruel, or exceptionally depraved manner." UTAH CODE ANN. § 76–5–202(1)(q) (1989). The United States Supreme Court has held this language to be unconstitutionally vague, however, because "[t]here is nothing in these few words ... that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In order to remedy this vagueness problem, the legislature amended the statute to clarify its meaning and to limit the types of cases to which the "especially heinous" aggravating circumstance could apply, adding that an especially heinous murder is one that is "demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death." UTAH CODE ANN. § 76–5–202(1)(q) (1989).

▮ ¶ 65 This court placed an additional gloss on the new version of subpart (q) in *State v. Tuttle*, 780 P.2d 1203 (Utah 1989). The court stated in *Tuttle* that "if subpart (q) is interpreted too literally, it would include all murders not resulting in instantaneous death" because all murders involve serious bodily injury. *Id.* at 1216. To avert this

problem, the court further limited the range of murders that could qualify as especially heinous. An intentional homicide is committed in "an especially heinous, atrocious, cruel, or exceptionally depraved manner" only if the facts demonstrate (1) that the defendant inflicted "physical torture, serious physical abuse, or serious bodily injury [upon] the victim before death" which is "qualitatively and quantitatively different and more culpable than that necessary to accomplish the murder," and (2) that any of these forms of abuse were inflicted upon the victim while the defendant was in a "mental state materially more depraved or culpable than that of most other murderers." *Id.* at 1216–17. Unless there is a convergence of serious physical abuse and a depraved mental state (both of which must exceed that which is normally required to intentionally kill the victim), the "especially heinous" aggravating circumstance is not applicable to the case. *See id.* at 1218.

¶ 66 Archuleta does not deny that he was in a depraved mental state at the time he inflicted the tire iron assault and other injuries upon Church. He only asserts that physical torture, serious physical abuse, or serious bodily injury of the victim must occur before he loses consciousness, a showing that was not made at trial.

▮ ¶ 67 We now hold that the "especially heinous" aggravating circumstance does not require that the victim have a conscious awareness of pain during the depraved attack. The only requirement that appears in the language of the statute is that the torture, physical abuse, or bodily injury occur prior to death. The statute says nothing of

whom mercifully may have been quickly rendered unconscious at the outset of the homicidal assault, not only promises to be futile, but are unnecessary.... The murderer ... may not assert the victim's condition as a fortuitous defense to his own deplorable acts."); *State v. Kingsley*, 252 Kan. 761, 851 P.2d 370, 392 (1993) (holding that "what is relevant to [the determination that a murder was especially heinous, atrocious, or cruel] is the manner in which the victim was murdered. That determination ends upon the death of the victim and not when the victim is rendered unconscious."); *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699, 710 (1989) (rejecting "the suggestion that the Common-

wealth be required to prove how long a victim can withstand an attack or how long the victim was conscious as a measure of how much pain and suffering was experienced."); *State v. Johnson*, 338 S.C. 114, 525 S.E.2d 519, 526 (2000) ("Physical torture is not predicated upon the amount of pain suffered by a murder victim. Although conscious awareness of pain may buttress the conclusion that the victim was subjected to serious physical abuse before death, its absence does not foreclose a finding of physical torture; the abusive and depraved nature of the homicidal assault is not erased solely because the victim mercifully may have been rendered unconscious at the outset of the attack.").

the victim's consciousness during the attack. We recognize that common definitions of physical torture involve "the infliction of intense pain . . . to punish or coerce someone." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2414 (1986). And, as Archuleta points out, if Church was rendered unconscious by blows to his head, he would not have felt the pain of the multiple unnecessary and depraved assaults he endured between the time of his being rendered unconscious and his death.

¶ 68 We need not resolve whether the depraved infliction of physical injury on an unconscious person qualifies as "torture" under subpart (q), however. In addition to torture, that provision defines an "especially heinous" murder as one involving "serious physical abuse" and "serious bodily injury." Those terms do not suggest that conscious awareness of pain is a necessary prerequisite to a finding that physical abuse or bodily injury occurred. "Bodily injury," for example, is defined by statute as "physical pain, illness, *or any impairment of physical condition,*" UTAH CODE ANN. § 76–1–601(3) (2008) (emphasis added); and "serious bodily injury" is defined as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death," *id.* § 76–1–601(10). When he rammed the tire iron into Church's rectum so far that it pierced his liver, Archuleta at a minimum impaired the function of one of Church's organs unnecessarily and with a depraved mental state. Under this analysis, Church could have been rendered completely unconscious by the blows to his head while still suffering physical abuse that is quantitatively greater and qualitatively more severe than the physical abuse necessary to accomplish an act of murder. *See Boggs v. Commonwealth,* 229 Va. 501, 331 S.E.2d 407, 421 (1985) ("For purposes of the 'vileness' determination, it is immaterial whether the decedent remained conscious during the course of several assaults. The number or nature of the batteries inflicted upon the victim is the essence of the test whether the defendant's conduct was outrageously or wantonly vile, horrible or inhuman in that it involved . . . an aggravated battery." (alteration in original) (citation omitted) (internal quotation marks omitted)).

¶ 69 Accordingly, the habeas court did not err in granting summary judgment to Respondent on this claim. The prosecution was not required to demonstrate that Church was conscious at the time he was assaulted with the tire iron, and Archuleta's counsel thus did not render ineffective assistance of counsel by not raising this claim at trial or on direct appeal.

6

¶ 70 Archuleta next challenges trial counsel's failure to object to the admission of the autopsy report and appellate counsel's failure to raise this issue on appeal. To support these claims, Archuleta cites *State v. Carter,* 888 P.2d 629, 643 (Utah 1995) (superseded by statute), for the proposition that a party who is allowed to admit evidence on a disputed issue in written form will be unfairly advantaged over the party who admits evidence on the issue in oral form only. Because the prosecution was permitted to admit the 21–page autopsy report, which detailed numerous of Church's horrific injuries, while the jurors were left to their collective recollection of the oral cross-examination of the medical examiner, Archuleta argues that the prosecution was given an unfair advantage that should have been prevented by a timely objection from trial counsel.

¶ 71 The habeas court rejected this claim and granted Respondent's summary judgment motion on this issue on both *Strickland* prongs. First, the habeas court noted that in *State v. Kell,* this court held that a medical examiner's report is not inadmissible on grounds of hearsay and lack of confrontation if the "medical examiner relied on the report in her testimony at trial . . . [and] [d]efendant had ample opportunity to cross-examine her regarding the report itself." 2002 UT 106, ¶ 37, 61 P.3d 1019. Because the medical examiner in Archuleta's case testified at trial and defense counsel cross-examined her, the habeas court held that it would have been futile to challenge the admissibility of the autopsy report in light of our holding in *Kell.* Accordingly, it

was not unreasonable for counsel to choose to not challenge the admission of the autopsy report.

¶ 72 Moreover, as to the second *Strickland* component, the court noted that "nowhere in his pleadings has [Archuleta] presented evidence demonstrating that there is a genuine issue with respect to the prejudice prong—i.e., that counsel's failure would have had an effect on the outcome of the guilt or innocence phase of the trial," or that "there is a genuine issue of material fact with respect to whether such a claim probably would have resulted in a reversal on appeal." Based on its conclusions regarding both *Strickland* prongs, the habeas court granted Respondent's motion for summary judgment on this issue.

¶ 73 We agree with both lines of analysis set forth by the habeas court, and we accordingly affirm the court's grant of summary judgment on this issue.

7

¶ 74 At both the guilt and penalty phases, the trial court instructed the jury that the prosecution had the burden of proof beyond a reasonable doubt. The court defined "reasonable doubt" as follows:

[A] reasonable doubt is a doubt based on reason and common sense growing out of the evidence or lack of evidence in the case. Proof beyond a reasonable doubt does not require proof to an absolute certainty but requires that degree of proof which satisfies the mind and convinces the understanding of those who are bound to act conscientiously upon it.

¶ 75 Archuleta claims that his counsel should have challenged this definition both at trial and on appeal, and that failure to do so constituted ineffective assistance of counsel. Archuleta contends that the trial court's reasonable doubt instruction was constitutionally deficient insofar as it failed to *affirmatively* define the appropriate standard of proof. That is, the definition provided by the court failed to distinguish between what is required for a finding beyond a reasonable doubt, and a finding based upon lesser standards of proof, like the clear and convincing evidence or preponderance of the evidence standards. According to Archuleta, this makes the trial court's reasonable doubt instruction constitutionally deficient because, presumably, it "allow[ed] a finding of guilt based upon a degree of proof below that required by the Due Process Clause." *Cage v. Louisiana,* 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).

¶ 76 The habeas court dismissed this claim on summary judgment because Archuleta failed to demonstrate that there is any genuine issue of material fact related to whether the decision by either trial or appellate counsel to not raise this issue was reasonable under prevailing professional norms. Specifically, Archuleta, in opposing summary judgment, identified no authority indicating that a trial court must contrast the definition of proof beyond a reasonable doubt with lesser standards of proof.

¶ 77 We affirm the habeas court's decision. It is well settled that

the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. . . . [S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.

*Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (citations omitted). Constitutional problems arise only when courts incorrectly define "reasonable doubt" so that they effectively make the state's burden something less than "beyond a reasonable doubt." *See id.* at 5–6, 114 S.Ct. 1239. Thus, to establish ineffective assistance, Archuleta must prove that defense counsel overlooked an error in the instruction that made the state's burden lower than "beyond a reasonable doubt." He has not done so.

¶ 78 Finally, Archuleta complains about the trial court's reference to " 'that degree of proof which satisfies the mind and convinces the understanding of those who are bound to act conscientiously upon it.' " Again, Archule-

ta cites no authority available to counsel demonstrating that this language was constitutionally infirm. In fact, at the time of Archuleta's trial, both this court and the United States Supreme Court had rejected challenges to instructions incorporating this language. *Hopt v. People,* 120 U.S. 430, 440, 7 S.Ct. 614, 30 L.Ed. 708 (1887); *State v. Tillman,* 750 P.2d 546, 572–73 (Utah 1987).

¶ 79 In sum, Archuleta points to no case that would have alerted defense counsel to any flaw in the trial court's reasonable doubt instruction. He has not shown that any challenge to the instruction had a reasonable chance of succeeding. We accordingly affirm the judgment of the habeas court on this issue.

8

¶ 80 Archuleta next contends that trial counsel provided ineffective representation when he failed to "ask for a jury instruction requiring the jury to find each penalty phase aggravating circumstance beyond a reasonable doubt and unanimously." He also contends that "he was denied effective assistance of counsel on appeal when the issue was not raised in that forum."

¶ 81 We have entertained this claim before. The petitioner in *Carter,* for example, asked this court to "adopt[ ] a death sentencing scheme which would require the jury to unanimously and specially find, beyond a reasonable doubt, each aggravating factor upon which it relies in imposing its sentence." 888 P.2d at 655. Only then, the petitioner argued, could he be given a "fair hearing." *Id.*

¶ 82 The *Carter* court declined to adopt such a sentencing scheme. We held,

[g]iven the procedures required at trial and the careful appellate review given by this Court to death penalty cases over the years, a specification of reasons by the sentencing authority on the record for imposing the death penalty, even if it were practicable, is not necessary to prevent arbitrary and capricious sentences. Indeed, such a procedure would be extraordinarily cumbersome, especially when a jury would have to agree unanimously on a statement of reasons under the process outlined in *Wood.*

*Id.* at 656 (alteration in original) (quoting *Holland,* 777 P.2d at 1025. The court accordingly dismissed the petitioner's arguments.)

¶ 83 Archuleta acknowledges our holding in *Carter,* but he nevertheless argues that juror unanimity at the sentencing phase was required on each aggravating factor. In support of this contention, Archuleta points to a United States Supreme Court decision from 2002 that held that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it— must be found by a jury beyond a reasonable doubt." *Ring v. Arizona,* 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). According to Archuleta, this holding supersedes *Carter* and requires capital sentencing juries to unanimously find, beyond a reasonable doubt, the existence of an aggravating factor before that factor may be relied upon to reach a sentence of death at the penalty phase.

¶ 84 The habeas court rejected this claim. It held that *Ring* does not alter or call into question Utah's case law on this issue. In Archuleta's case, the jury convicted him of first degree murder by *unanimously* finding, beyond a reasonable doubt that he intentionally or knowingly caused Church's death under four statutory aggravating circumstances. As a result of his unanimous conviction, Archuleta became eligible for the death penalty, subject to a comparative weighing of all aggravating and mitigating circumstances by the penalty phase jury. Thus, the habeas court held that it was not ineffective assistance for Archuleta's counsel to fail to raise this claim at trial or on appeal.

¶ 85 We affirm this holding. First, *Ring* was decided in 2002 and was thus not available to Archuleta's counsel at trial or on appeal. The law available at the time of Archuleta's trial did not require unanimity on individual aggravating circumstances, and counsel accordingly did not perform unreasonably in not raising this claim. At that time, the law required unanimity only on whether the totality of the aggravating cir-

cumstances outweighed the totality of the mitigating circumstances. *Wood,* 648 P.2d at 83–84. The trial court correctly instructed the jury on that burden. In fact, six years after Archuleta's trial, this court made clear that the sentencing jury is not obligated to reach unanimity on individual sentencing phase aggravating circumstances. *See Carter,* 888 P.2d at 655–57.

¶ 86 Second, *Ring* does not require a unanimous jury determination on whether to impose a death sentence, but holds only that the Sixth Amendment guarantees a jury determination beyond a reasonable doubt on any fact that makes death a *possible* sentence. *Ring,* 536 U.S. at 596–609, 122 S.Ct. 2428. Under Arizona law, the facts that the defendant's jury found during the guilt phase exposed him to a maximum possible sentence of life. *Id.* at 596, 122 S.Ct. 2428. The maximum possible sentence did not increase to include death until the sentencing judge found at least one statutory aggravate at the penalty phase. *Id.* at 597, 122 S.Ct. 2428. *Ring* held that the Sixth Amendment guaranteed a jury determination beyond a reasonable doubt only on that issue. *Id.* at 609, 122 S.Ct. 2428.

¶ 87 In Utah, the fact finder in the guilt phase must find—unanimously and beyond a reasonable doubt—the statutory aggravator that makes death a possible sentence. Utah Code Ann. § 76-5-202(3) (1989). The maximum possible sentence does not increase at the subsequent penalty phase. Rather, the sentencing jury decides only whether to impose the maximum possible sentence. *Ring* does not require a unanimous jury determination on that issue. Therefore, it does not call into question controlling Utah precedent that Archuleta has no constitutional right to require the jury to find unanimously and beyond a reasonable doubt each aggravating circumstance it considers in selecting the sentence.

¶ 88 During proceedings at the penalty phase of trial, the trial court instructed the jury "that the instructions previously given to you in the guilt phase of the trial are to apply in the penalty phase where applicable."

Archuleta contends that trial counsel rendered ineffective assistance by failing to challenge this instruction, and that appellate counsel rendered ineffective assistance when he didn't raise this issue on appeal. Archuleta claims that this instruction created a conflict among the guilt phase and penalty phase instructions, which ultimately prevented the sentencing jury from giving mitigating effect to evidence that Archuleta was intoxicated at the time of the crime.

¶ 89 The evidence at trial indicated that Archuleta had consumed alcohol before the homicide and that he "felt it." There was a conflict in the evidence, however, as to the extent of Archuleta's alcohol impairment. The jury was instructed during the guilt phase that "[i]t is not a defense to a crime that a person has merely been drinking or is intoxicated" and that "[b]eing under the influence of alcohol is not an excuse for the commission of a crime where it merely makes a person more excited or reckless, so that one does things which he might not otherwise do." During the penalty phase, however, the jury was instructed that it is a mitigating circumstances that "[a]t the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of ... intoxication." Archuleta contends that because the trial court told the jury that the guilt or innocence phase instructions applied during the penalty phase "where applicable," without any further elaboration, the jury gave inadequate weight to the penalty phase instruction.

¶ 90 The habeas court rejected this ineffectiveness claim. For starters, the trial court instructed the jury that it could rely on the guilt or innocence phase instructions only if they were applicable. Given that the penalty phase instructions regarding intoxication contradicted the guilt or innocence phase instruction, the "where applicable" proviso kicked in and instructed the jury to disregard the guilt or innocence phase instruction. Moreover, the habeas court noted that during the penalty phase "the court instructed the jury that mitigating circumstances may include circumstances which do

not constitute justification or excuse for the crime but which may be considered as extenuating or reducing the moral culpability or blame." "Because the jury was expressly informed that circumstances which do not excuse the crime may still constitute mitigating evidence," the habeas court continued, "no conflict was created by the trial court's instructions and, therefore, neither trial nor appellate counsel provided ineffective assistance of counsel in choosing not to raise this issue." We agree with the habeas court's astute analysis and affirm its rejection of this claim.

### 10

¶ 91 The United States Supreme Court has held that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Archuleta contends that trial counsel provided ineffective assistance by failing to object to penalty phase instructions that, in his estimation, unduly broadened the class of persons eligible for the death penalty by allowing for "double counting" of aggravating circumstances. Specifically, the penalty phase instructions required jurors to consider four specific aggravating circumstances in weighing the totality of aggravating evidence against the totality of mitigating evidence even though, according to Archuleta, the evidence supports only one or two aggravating circumstances. He contends that "the kidnapping and the object rape conflate into the aggravated kidnapping and heinousness factors. It is also arguable that the aggravated kidnapping conflates into heinousness." According to Archuleta, because single acts committed by him were divided into multiple aggravating circumstances, when considered together these circumstances failed to genuinely narrow the class of persons eligible for the death penalty. In Archuleta's view, trial counsel thereby provided ineffective assistance of counsel by failing to object to the penalty phase instructions, and appellate counsel provided ineffective assistance of counsel in failing to raise this issue on appeal.

¶ 92 We entertained a similar claim in *Parsons*, 871 P.2d at 516. The habeas petitioner in *Parsons* argued that "including both the robbery-murder factor and the pecuniary-gain factor on the special verdict form unfairly divided a single act of the defendant, aggravated robbery, into two aggravating factors." *Id.* at 528. The *Parsons* court held that "[i]n failing to object to the special verdict form on these grounds, counsel's performance fell below an objective standard of reasonableness." *Id.*

¶ 93 Whether or not this case aligns with *Parsons* on the issue of the reasonableness of counsel's performance, the habeas court was correct to conclude that Archuleta has not demonstrated prejudice under the second *Strickland* component. In *Parsons*, although we concluded that counsel had performed below an objective standard of reasonableness by not raising a double-counting concern, we held that the "jury was instructed sufficiently to cure any prejudice that may have resulted from the improper double-counting on the special verdict form." *Id.* at 529. The double-counting of aggravating circumstances in *Parsons* did not result in prejudice to the defendant because the trial court (1) required "a unanimous determination on each of [the] aggravating factors before they could be weighed against the mitigating factors," *id.* (internal quotation marks omitted), and (2) "specifically instructed the jury that it must weigh the totality of the mitigating factors against the totality of the aggravating factors, '*not in terms of the relative numbers* of the aggravating and mitigating factors, but in terms of their respective *substantiality and persuasiveness.*'" *Id.*

¶ 94 In Archuleta's trial, following deliberations at the guilt or innocence phase, the jurors concluded unanimously and beyond a reasonable doubt that the kidnapping, aggravated kidnapping, object rape, and heinousness aggravating circumstances all applied to Church's murder. *See Archuleta I*, 850 P.2d 1232, 1235 n. 3 (Utah 1993). In addition, the trial court instructed the jury that it should consider the aggravating and mitigating cir-

cumstances in terms of their persuasiveness and not in terms of their relative numbers. And counsel for both parties each emphasized the court's instruction during their closing arguments. Accordingly, the habeas court was correct to grant summary judgment on this claim because Archuleta failed to demonstrate that a genuine issue of material fact exists with respect to whether there is a reasonable probability that, absent trial counsel's failure to object to the trial court's instructions, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. For the same reasons, Archuleta also has not shown that a genuine issue of material fact exists with respect to whether appellate counsel provided ineffective assistance of counsel. We accordingly affirm the decision of the habeas court.

11

¶ 95 One class of Archuleta's ineffective assistance of counsel claims survived summary judgment. The habeas court denied Respondent's motion for summary judgment and ordered a hearing on the question whether trial counsel rendered ineffective assistance in its investigation and presentation of mitigating evidence at the sentencing phase of the trial, and whether appellate counsel rendered ineffective assistance by failing to raise these claims on appeal. A diligent search for and competent presentation of mitigating evidence is a crucial component of a capital defendant's defense. Mitigating evidence is any evidence "directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Such evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *see also* UTAH CODE ANN. § 76–3–207(4) (listing specific mitigating circumstances). Of particular relevance, evidence of "physical and sexual abuse and diminished mental capacities compose the

kind of 'troubled history' that may diminish moral culpability." *Wilson v. Sirmons*, 536 F.3d 1064, 1084 (10th Cir.2008) (quoting *Wiggins*, 539 U.S. at 535, 123 S.Ct. 2527), *affd. on reh'g en banc sub nom. Wilson v. Workman*, 577 F.3d 1284 (10th Cir.2009).

¶ 96 Defense counsel in capital cases must investigate all reasonably available sources and present mitigating evidence unless there is a strategic reason not to do so. *See Wiggins v. Smith*, 539 U.S. 510, 527–28, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). That said, when the issue is the adequacy of counsel's investigation for the sentencing phase of a capital trial, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made." *Rompilla v. Beard*, 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Indeed, reasonably informed strategic choices are almost unassailable.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. "To assess the thoroughness of counsel's investigation and counsel's overall performance, the Court must conduct an objective review measured for 'reasonableness under prevailing professional norms.'" *Wilson*, 536 F.3d at 1083 (quoting *Wiggins*, 539 U.S. at 523, 123 S.Ct. 2527). And as we have noted elsewhere, a defendant seeking to establish ineffective assistance of counsel at any phase of the trial must "overcome the strong presumption that trial counsel ren-

dered adequate assistance and exercised reasonable professional judgment." *Bullock*, 791 P.2d at 159–60; *see also Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.

¶ 97 After hearing the evidence that Archuleta claimed his trial counsel should have presented at the 1989 sentencing phase but did not, the habeas court ruled that Archuleta had failed to prove either element of his ineffective assistance claim. Among other things, the habeas court reasoned that Archuleta's 1989 mitigation case suggested that Wood, not Archuleta, tortured and murdered Church and that the Sixth Amendment did not require trial counsel to present a mitigation case that contradicted Archuleta's trial testimony. The habeas court also reasoned that the 2006 evidence presented a double-edged sword. Although it may have provided culpability-reducing explanations about why Archuleta tortured and murdered Church, it also presented aggravating evidence of future dangerousness. Counsel assiduously endeavored to avoid this evidence because they viewed it to be more harmful than beneficial to Archuleta's mitigation case. After providing some additional factual background, we affirm the decision of the habeas court on these claims.

### (a) Additional Facts

#### (i) 1989 Penalty Phase Preparation

¶ 98 Two attorneys represented Archuleta at the 1989 trial—lead counsel Michael Esplin and junior counsel Brent Bullock. Esplin had nearly nineteen years of experience, including fourteen years as a criminal defense attorney. Bullock, in contrast, was fresh out of law school. Despite his relative inexperience trying cases, however, Bullock had extensive experience investigating capital cases for the state. Bullock testified at the 2006 hearing that his experience taught him what to prepare when representing a capital defendant and where the "danger zones" were.

¶ 99 In preparation for Archuleta's 1989 trial, trial counsel engaged the services of Dr. Robert Howell, a board-certified forensic psychologist, to investigate Archuleta's mental health history. Dr. Howell had extensive experience investigating and testifying as an expert in criminal cases. Counsel asked Dr.

Howell to identify mental health issues that would be relevant to the penalty phase, including whether Archuleta had organic brain damage. Dr. Howell's investigation did not uncover brain damage, and he never advised counsel to consult experts from other disciplines to look into potential mental health issues beyond Dr. Howell's expertise.

¶ 100 Esplin and Bullock scoured Archuleta's Utah State Hospital records, social service and adoption records, school records, and prison records in search of mitigating evidence. They testified that they "spent a lot of time" on the case, "pour[ed]" over the records for penalty phase evidence, and discussed the records with Archuleta. They also provided Dr. Howell with police reports, mental health records from Timpanogos Mental Health Center and the Utah State Hospital, prison records from the Utah State Prison and Cedar City jail, records from Charitable and Custody Services, and juvenile records.

¶ 101 Trial counsel interviewed Archuleta's adoptive family. They searched for, but were unable to locate, Archuleta's birth mother. They interviewed a number of individuals referred to in Archuleta's children's services records. And they interviewed various individuals from Archuleta's past. They even interviewed one of Archuleta's childhood baseball coaches, for example, but decided not to call him to testify because his testimony would have opened the door to detrimental evidence that was not already in the record or known to the state. Esplin also recalled having secured unfavorable evidence from a schoolteacher regarding sadistic behavior such as harming animals.

¶ 102 Esplin testified that he and Bullock consciously chose not to call several of the witnesses that they contacted. He also stated that for any witness not called to testify, they chose not to call the individual only after determining that the witness's testimony would cause more harm than benefit to Archuleta's mitigation case.

¶ 103 Defense counsel additionally searched prison records for evidence that Archuleta would not pose a threat to others if given a life sentence. The evidence discover-

ed proved to be of more harm than help, however. The records revealed a document Archuleta wrote entitled "HEAT," which explained how to conduct home invasion robberies. In the document, Archuleta advised shooting "when necessary" and cautioned against committing murder "when first starting." Because of the obviously harmful content of this evidence, trial counsel sought to exclude it at the penalty phase. In the same vein, the defense successfully excluded evidence of an assault that Archuleta committed while incarcerated at the Millard County jail. But the state indicated that it would present the evidence if Archuleta attempted to prove that he possessed a "peaceful nature."

¶ 104 Trial counsel considered the possibility that Archuleta had suffered sexual abuse as a youth at either the Utah State Hospital or the Utah State Prison. Bullock looked for, but could not find, evidence of such abuse, however. And when questioned on the subject by Esplin and Bullock, Archuleta repeatedly denied that he had been sexually assaulted.

¶ 105 Finally, both Esplin and Bullock testified that they did not in any way limit their representation or forgo reasonable investigation leads due to budgetary limitations. And Esplin testified that, in his view, Dr. Howell likewise pursued all reasonable avenues in pursuit of Archuleta's mental health history.

### (ii) 1989 Penalty Phase

¶ 106 During the penalty phase proceedings, the state largely relied on the gruesome details of Church's murder that had been established during the guilt phase of the case. In addition to those facts, the state called David Homer, a fellow inmate with Archuleta shortly after the murder. Homer testified that Archuleta bragged to him that killing Church "was the ultimate rush, that there was—that you couldn't get any kind of high from any kind of drugs from it all. [Archuleta] said that the evil had completely taken over him. And that once he started, they couldn't stop." The prosecution also established that Archuleta had two prior convictions that resulted in prison time—for firearm theft and for arranging to distribute

a controlled substance—and that Archuleta was on parole at the time of the murder.

¶ 107 Archuleta testified on his own behalf at the penalty phase. He expressed remorse that Church had died, and he agreed that he should be punished for his role in the murder. But he repeated his claim that he did not kill Church. He also testified that he told Homer how Church died and about "his role" in the murder. He denied telling Homer that killing Church was a natural high, however, and he denied telling Homer that he struck any of the blows inflicted on Church. Archuleta also testified about his first childhood memories. He testified of meeting the Archuletas, and of staying at the Utah State Hospital and attending school there. He recalled a girl at the hospital who was "kind of" mentally retarded. He testified that he would "watch and take care [of her] quite a bit."

¶ 108 Archuleta's adoptive parents and sister each testified. They testified that although Archuleta first came into their home as a foster child, the family was excited to have him and intended to keep him permanently. They described Archuleta's deplorable condition when he first came to the family. He had a grill pattern burn scar on his buttocks and cigarette burns on his buttocks and arms. He feared warm water, demanded to be bathed only in cold water, feared closed and locked doors, and hoarded food. They described his lifelong inability to concentrate and the problems it caused him in school. They also related positive aspects of Archuleta's character—that he loved and cared for children—and that he cared for an elderly neighbor and an elderly grandmother. They described their efforts to help him overcome his hyperactivity. And they reaffirmed their love and affection for him despite the despicable nature of his crime.

¶ 109 Dr. Howell testified that Archuleta's birth mother was sixteen at the time of Archuleta's birth, that she went to the Utah State Industrial School immediately thereafter, and that after her release Archuleta lived with her and various of her boyfriends. He related that Archuleta first came into contact with Charitable and Custody Services when he was approximately three and a half

years old. Records from that contact reported Archuleta's burns; a large, infected scab on his arm that also looked like a burn; and that he was in a filthy state. They noted that Archuleta was terrified of bath water, which, according to Dr. Howell, suggested that he had been scalded by hot water several times. He told the jury that Archuleta had no stability until the Archuletas took him in at age five.

¶ 110 It was Dr. Howell's expert opinion that pregnancy is the most important period in a child's development and that the first five years, combined with a child's biological background, are very important in shaping personality. He concluded that Archuleta's records demonstrated that he suffered from attention deficit hyperactivity disorder (ADHD) and that the disorder had continued into Archuleta's adulthood. He catalogued the primary problems that ADHD causes: difficulty paying attention, impulsiveness, and inability to sit still. He testified that these primary problems lead to secondary problems such as teachers not wanting ADHD children in school, which often leads to rebelliousness. In adulthood, problems secondary to childhood ADHD include substance abuse, depression, irritability, and antisocial behavior. He also testified that ADHD impairs a person's judgment and that alcohol will impair an ADHD sufferer's judgment more than it will a normal person's. Dr. Howell noted that Archuleta never received appropriate treatment for his ADHD.

¶ 111 In closing argument, the prosecution primarily argued that the especially heinous nature of Church's torture-murder justified a sentence of death. The prosecution contended that Archuleta acted deliberately, focusing on the opportunities Archuleta had to withdraw from the murder and other facts suggesting that Archuleta participated willingly and at least equally. The prosecution also asked the jury to consider the lack of value Archuleta put on human life, Archuleta's dehumanization of Church, and Archuleta's prior crimes. The prosecution did not argue that the jury should impose a death sentence because Archuleta posed a future threat.

¶ 112 Defense counsel primarily repeated the argument that Wood, not Archuleta, tortured and killed Church, and that because Archuleta played only a minor role in the brutal murder he was therefore less deserving of the death penalty. But counsel also emphasized the mitigating evidence from Archuleta's past that had been presented. Counsel reminded the jury about the evidence of Archuleta's physical and emotional abuse, and of his birth mother's inadequacy as a parent. Counsel argued that Archuleta's mental and developmental deficits adversely affected his ability to make appropriate choices, and that circumstances beyond Archuleta's control caused those deficits. Counsel further argued that Archuleta's criminal history did not amount to the kind of violent history that the capital sentencing statute contemplated as aggravating.

### (iii) 2006 Post–Conviction Evidence

¶ 113 New counsel represented Archuleta at the 2006 post-conviction hearing. Aided by his new habeas counsel, Archuleta presented penalty phase evidence that he claims Esplin and Bullock should have presented but did not at the sentencing phase of the 1989 trial. Some of the new testimony, especially that of Archuleta's family called to testify a second time, duplicated testimony given in 1989. The bulk of the new testimony dealt with a re-diagnosis of Archuleta's mental health that depicted a more troubled mental state than the 1989 diagnoses provided by Dr. Howell.

¶ 114 Archuleta called Drs. Linda Gummow and Mark Cunningham to testify. Dr. Gummow, a neuropsychologist, performed several tests on Archuleta and concluded that Archuleta suffered from mild global neurocognitive impairment in the areas of spelling, arithmetic, and the ability to write. She testified that her scores demonstrated that Archuleta had impaired executive functioning, which "can sometimes" cause difficulty in the emotional and cognitive aspects of decision making. She further testified that Archuleta reported to her that two male staff members at the Utah State Hospital sexually assaulted him three times when he was a youth. She acknowledged that Archuleta did not report the sexual abuse to his defense counsel in 1989, however. Based on the pre-

viously undisclosed evidence of sexual assault and on her contemporary tests of Archuleta, Dr. Gummow testified that she diagnosed Archuleta with post-traumatic stress disorder, principally caused by the sexual abuse.

¶ 115 Dr. Gummow also testified extensively about fetal alcohol exposure. She opined that Archuleta exhibited a combination of fear and aggression unique to children exposed to alcohol while in utero. Dr. Gummow conceded on cross-examination, however, that assessing fetal alcohol exposure requires medical training that she lacked. Dr. Gummow also asserted that, in 1989, she would have diagnosed Archuleta with organic mood disorder because, in her view, Archuleta exhibited organically based major depression problems. On cross-examination, she conceded that the diagnosis requires the presence of persistent depressive, elevated, or expansive mood. But when pressed, she failed to identify record evidence that would have alerted Dr. Howell or trial counsel to this possible diagnosis.

¶ 116 In conclusion, Dr. Gummow testified that her diagnoses and test data would have helped the sentencing jury understand Archuleta's participation in Church's murder. She argued that Archuleta's organically and socially based deficits both made him aggressive and impaired his ability to control his aggression.

¶ 117 In his testimony, Dr. Cunningham identified eighteen major damaging developmental factors that he believed made Archuleta a high risk for criminal violence.[9] Based on these factors, he diagnosed Archuleta with conduct disorder, which he described as a childhood version of anti-social personality disorder and which is identified by a pervasive disregard for the feelings and rights of others displayed on a repetitive and broad basis. He testified that Archuleta's

substance abuse presented a further risk factor for criminal violence. He further testified that the damaging developmental issues had implications for the inability to empathize with other persons and control behavior, "which would seem critical to understand as the jury is looking at [Archuleta's] conduct in this offense." Like Dr. Gummow, Dr. Cunningham referred to Archuleta's history of aggressive behavior, such as hitting other children and laughing and urinating on the school bus. He testified that Archuleta's records were "replete" with descriptions of how disturbed Archuleta was.

¶ 118 Dr. Cunningham identified Archuleta's recently reported sexual abuse history as an issue that would have helped explain the murder of Church. Archuleta's sexual abuse, Dr. Cunningham testified, increased the likelihood that Archuleta would act out aggressively.

¶ 119 Dr. Cunningham acknowledged that Archuleta's history and deficits made him a greater risk for "outburst outcomes," including future criminal violence if not confined in prison, and that greater development of the evidence of risk factors during the sentencing phase would have provided evidence to the jury that Archuleta was at risk for inexplicable violent acts and presented a broad risk of criminal violence. Despite this conclusion, however, Dr. Cunningham endorsed studies that purport to show that persons sentenced to life terms for capital crimes present a low risk for institutional violence. He also testified favorably of studies that claim that capital sentencing juries worry about future dangerousness even when it is not identified as an aggravating circumstance. The latter study was shown to postdate Archuleta's trial, however. And as for the particular persuasiveness of the former

---

9. These factors are: (1) multi-generational family distress; (2) disrupted primary attachment; (3) subsequent serial placements and continued attachment disruption; (4) inadequate paternal involvement; (5) inadequate structure and supervision in early childhood; (6) genetic predisposition to substance abuse and dependence; (7) parental alcohol and drug abuse; (8) teenage mother; (9) physical and emotional abuse; (10) child neglect; (11) sexually traumatic exposure— including sexual abuse; (12) untreated attention deficit hyperactivity disorder; (13) additional psychological disorders; (14) academic failure and learning disabilities; (15) peer alienation and community estrangement; (16) childhood onset alcohol abuse, subsequent adolescent onset poly-substance dependence, and intoxication at the time of the capital offense; (17) incarceration in an adult prison as an adolescent; and (18) community bigotry regarding sexual orientation.

study, Dr. Cunningham admitted that Archuleta had committed a violent assault during a prior incarceration about which the 1989 jury heard nothing. Further, Dr. Cunningham testified that past violence in the community is the best predictor of future violence in the community. Archuleta's sentencing jury had no life-without-parole option; it could sentence Archuleta only to death or an indeterminate life term.

¶ 120 With the exception of the additional information regarding Archuleta's biological mother and the recent assertion that Archuleta had been sexually abused, both Dr. Gummow and Dr. Cunningham relied on records that were available to and investigated by trial counsel. Those records, as well as Dr. Gummow's summary of them, were admitted as exhibits. The records available to and examined by trial counsel include significant detrimental evidence regarding Archuleta's character and potential future dangerousness. The records contain a report that Archuleta had a lengthy juvenile record, including four offenses that would have been felonies if he had been an adult. They detail Archuleta's long history of the kind of aggressive and assaultive behavior that trial counsel sought to exclude, including that (1) Archuleta killed a kitten by beating it with a board with a nail in it; (2) he sat in a yard mashing insects with a rock; (3) he hit other children, then laughed; (4) while housed at the Utah State Hospital, he habitually fought with children, seemed to have organized a gang structure with himself as the leader, and enjoyed being the boss of other children; (5) he could consider no other resolution of conflicts other than getting even; and (6) his hostile and angry feelings took the form of abusing other children.

### (b) Analysis

¶ 121 Based on the 1989 version of the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (the ABA Guidelines),[10] Archuleta contends that his trial counsel provided ineffective assistance by inadequately investigating and preparing for the penalty phase of the trial and by falling short of the standards for the presentation of mitigating evidence to the sentencing jury. In essence, Archuleta argues that trial counsel rendered ineffective assistance because they did not present what he views as the strong mitigating case that Dr. Gummow and Dr. Cunningham presented almost twenty years later. This failure resulted, in Archuleta's view, from certain failures on the part of trial counsel: (1) they did not hire a mitigation specialist, but instead relied on the services of Brent Bullock, who had never prepared a mitigation case before; (2) they unreasonably chose not to retain the services of a neuropsychologist to determine whether Archuleta suffered brain damage or other neurological impairment; (3) they failed to locate and interview Archuleta's birth mother and inadequately interviewed Archuleta and other family members for relevant mitigating information, including that Archuleta had been sexually abused as a child, thus failing to discover and present the additional mitigating evidence found by Dr. Gummow and Dr. Cunningham; and (4) they improperly elected to employ a strategy at sentencing that Archuleta only played a minor role in the murder. According to Archuleta, had trial counsel taken these steps, they would have presented powerful mitigating evidence that reasonably would have persuaded at least one juror to vote for a life sentence instead of a death sentence.

¶ 122 For reasons discussed below, we conclude that none of Archuleta's assertions establishes ineffective assistance of counsel. We therefore affirm the habeas court's dismissal of these claims.

---

10. The United States Supreme Court has on multiple occasions indicated that the ABA Guidelines extant at the time of challenged attorney performance form the baseline for what constitutes reasonable investigation. *See Rompilla,* 545 U.S. at 387 n. 7, 125 S.Ct. 2456 ("[The 1989] Guidelines appl[y] the clear requirements for investigation. . . ."); *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 ("[T]he standards for capital defense work articulated by the American Bar Association (ABA) . . . [should be used] as 'guides to determining what is reasonable.' " (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052)); *see also Wilson,* 536 F.3d at 1084–85 ("[T]o determine what is reasonable investigation, courts must look first to the ABA guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a capital case.").

(i)

■ ¶ 123 Archuleta first argues that trial counsel was ineffective because counsel did not retain a mitigation specialist to assist in the collection of evidence related to Archuleta's life history and background. Although Esplin hired Bullock to perform the mitigation investigation, Bullock had never prepared a mitigation case, and Archuleta argues that it was accordingly unreasonable for Esplin to rely on him to search for mitigating evidence and that his inadequate investigation failed to uncover powerful mitigating evidence from Archuleta's personal history that could have persuaded at least one juror to elect a life, rather than a death, sentence. Bullock's lackluster investigation, Archuleta maintains, caused trial counsel to overlook evidence that could have been obtained by a mitigation specialist of

fetal alcohol exposure, pervasive addiction to drugs and alcohol in Archuleta's family, the existence of a Mild Global Neurocognitive Impairment, a Reactive Attachment Disorder, evidence of severe sexual and physical abuse, Major Depressive Disorder, Post-traumatic Stress Disorder, ... and the Potential for Positive, Non–Violent Adjust to a Capital Life Term.

¶ 124 The habeas court rejected this claim because Archuleta failed to demonstrate that assigning Bullock the task of investigating mitigating evidence was unreasonable in 1989. Specifically, the court noted that in 1989 no Utah statute provided that an indigent capital defendant must be appointed a mitigation specialist. The court also held that Archuleta did not demonstrate that in 1989 the standard of practice in Utah required the hiring of a mitigation specialist. With respect to Bullock's experience, the court acknowledged that Bullock had not received formal training in investigating mitigation evidence, but the court found relevant Bullock's experience doing investigations for the prosecution in capital cases and his testimony that there was no relevant avenue of investigation that he did not pursue in trying to discover mitigating evidence. Finally, the court observed that with the exception of finding Archuleta's birth mother, Archuleta pointed to no evidence of his life history and background that his trial counsel did not have access to or was not familiar with that a mitigation specialist would have discovered had one been hired. The court accordingly held that Archuleta could not establish either *Strickland* prong based on counsel's decision to task Bullock with conducting a mitigation investigation. We agree with the habeas court's analysis.

■■ ¶ 125 We have held that although "[d]efense attorneys need not present all evidence uncovered by a mitigation workup, ... they absolutely must perform one." *State v. Taylor*, 947 P.2d 681, 687–88 (Utah 1997). But as *Strickland* makes clear, there is no "checklist for judicial evaluation of attorney performance ... [and] [n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." 466 U.S. at 688–89, 104 S.Ct. 2052. To the contrary, a rigid requirement that to effectively represent a capital defendant a capital defense attorney must employ a mitigation specialist "would interfere with the 'constitutionally protected independence of counsel' at the heart of *Strickland*." *Wiggins*, 539 U.S. at 533, 123 S.Ct. 2527. While it may be true that a mitigation specialist may have performed better than Bullock, such specialists are not the only reasonable manner in which a mitigation workup may be accomplished. Archuleta has not demonstrated that Bullock rendered unreasonably deficient performance or that he failed to pursue leads that a reasonably trained mitigation specialist would have pursued. Absent any showing of unreasonableness, we cannot say that counsel rendered ineffective assistance by hiring Bullock and giving him the task of performing a mitigation investigation.

(ii)

■ ¶ 126 Archuleta next contends that it was unreasonable for trial counsel to rely solely on the expertise of Dr. Howell to evaluate Archuleta's mental health and history. Instead, Archuleta claims, counsel should have retained the services of a neuropsychologist to determine whether Ar-

chuleta had brain damage or other neurological impairment. Had counsel done so, according to this view, a neuropsychologist would have rendered the same diagnoses of serious mental health issues that Dr. Gummow and Dr. Cunningham made years later. Archuleta asserts that it is counsel's duty to investigate all avenues of mitigating evidence and that because certain evidence was not uncovered because of Dr. Howell's recommendations, counsel rendered ineffective assistance.

¶ 127 The habeas court dismissed this claim because, in its estimation, trial counsel acted reasonably when they relied on the conclusions and recommendations of Dr. Howell—a respected, highly qualified, and board-certified forensic psychologist. Dr. Howell diagnosed Archuleta with ADHD and recommended against further psychological testing. Archuleta has not established that counsel's reliance on Dr. Howell was unreasonable, and we affirm the decision of the habeas court on this claim.

¶ 128 Trial counsel hired Dr. Howell to evaluate and report on Archuleta's mental condition. Counsel specifically asked Dr. Howell to recommend whether additional evaluations should be conducted. Trial counsel provided Dr. Howell with all available and relevant records that he would need to evaluate Archuleta. Based on his personal evaluations of Archuleta and review of the relevant records, Dr. Howell concluded that Archuleta suffered from ADHD. Dr. Howell never suggested to trial counsel that additional testing was needed for the purpose of investigating possible brain damage or any other mental health condition. Trial counsel testified at the 2006 hearing that had Dr. Howell recommended further investigation or testing,

counsel would have followed those recommendations.

¶ 129 The habeas court indicated that Archuleta presented no evidence, case law, or professional guidelines suggesting that it was unreasonable in 1989 for trial counsel to rely upon the professional advice of a qualified forensic psychologist in making decisions about the extent of the investigation into issues related to Archuleta's mental health status. And he has presented no such evidence on appeal. Yet courts have long held that it is reasonable for counsel to rely on the judgment and recommendations of qualified experts with expertise beyond counsel's knowledge.[11] "If an attorney [had] the burden of reviewing the trustworthiness of a qualified expert's conclusion before the attorney [was] entitled to make decisions based on that conclusion, the role of the expert [would be] superfluous." *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir.1995). We accordingly affirm the habeas court's conclusion that it was reasonable for trial counsel to rely on Dr. Howell's expert advice.

¶ 130 The habeas court further concluded that habeas counsel identified no facts about Archuleta or his conduct that would have alerted trial counsel to the possibility that Archuleta suffered from neurological impairment, calling for further investigation or evaluation. The habeas court referred to testimony by trial counsel that they had met with Archuleta ten to twenty times and that they witnessed no cause for concern over his mental abilities. In fact, Archuleta testified at both phases of the trial without any indication that he had neurological problems. The habeas court accordingly concluded that it was not unreasonable for counsel to forgo additional mental health testing given their perspective and the information available to

**11.** *See Jacobs v. State*, 2001 UT 17, ¶ 23, 20 P.3d 382 (holding that in context of competency determination, "it was a reasonable exercise of professional judgment for [defendant's] counsel to rely on the experts' unanimous conclusion that [defendant's bizarre] behavior did not make him incompetent to stand trial."); *see also Sims v. Brown*, 425 F.3d 560, 585 (9th Cir.2005) ("[A]ttorneys are entitled to rely on the opinions of mental health experts...."); *Walls v. Bowersox*, 151 F.3d 827, 835 (8th Cir.1998) ("It was entirely reasonable for counsel to rely on the conclusion of two trained psychiatrists that no

additional testing was warranted.... Likewise, the Constitution does not require counsel to shop around for more elaborate tests that could be requested on the off chance that they will reveal some exotic disorder."); *Jones v. Murray*, 947 F.2d 1106, 1112 (4th Cir.1991) ("[W]e conclude that counsel's decision, based upon the advice of these psychologists that his client suffered from no mitigating psychiatric conditions at the time of his crimes, not to devote additional time and effort to further evaluation was within the range of reasonable professional judgment.").

them. This conclusion was correct, and Archuleta accordingly cannot establish the first prong of *Strickland.*

¶ 131 "[C]ounsel is not ineffective if he or she has no reason to think that a mental examination would be useful." *Riley v. Taylor,* 277 F.3d 261, 306 (3d Cir.2001). From counsel's perspective, additional mental health testing of Archuleta was unnecessary. Neither Dr. Howell nor counsel's interaction with and observations of Archuleta indicated otherwise. This decision was reasonable under the circumstances and, therefore, Archuleta has not shown that trial counsel acted deficiently in not investigating and presenting evidence of Archuleta's mental health status beyond the evaluations performed by Dr. Howell.

### (iii)

¶ 132 Archuleta contends that trial counsel was deficient in failing to locate and interview Archuleta's birth mother and in failing to uncover evidence that Archuleta had been sexually abused. But in both instances, Archuleta has not demonstrated that counsel's search for this evidence was deficient or that counsel ignored available leads that a reasonable attorney would have followed up on.

 ¶ 133 With respect to his birth mother, Archuleta asserts that had counsel located and interviewed her,

they would have learned that she was 15 years old when she became pregnant with [Archuleta], that she only learned she was pregnant until well into her pregnancy, that she was very undernourished during the pregnancy and that she only added ten pounds to her tiny 90–pound frame. Had they found and interviewed her, trial counsel and his investigator would have learned that when [Archuleta's] birth mother did learn she was pregnant, at 6–months into her pregnancy, she wore a girdle to compress her abdomen to hide the pregnancy from her father. Upon investigation, trial counsel would have learned that [Archuleta's] birth mother was the eldest of thirteen children in her family and when her father learned she was pregnant, he beat her, causing her to flee her home to give birth to [Archuleta] and received no prena-

tal care.... [T]rial counsel and his investigator ... [also] would have discovered her history and drug and alcohol abuse, her poor health and unhealthy lifestyle, factors which would have reasonably initiated an investigation into whether [Archuleta] suffered from Fetal Alcohol Exposure, which exacerbated the prenatal stress he received *in utero.*

¶ 134 Regardless of whether this claimed evidence would have made a difference to the sentencing jury's determination, Archuleta has not shown (or even alleged) that counsel's inability to locate Archuleta's birth mother resulted from unreasonable or lackluster investigation. Counsel testified that they searched for Archuleta's mother but could not locate her. And without evidence to the contrary, we must presume that that effort was reasonable. *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ("Counsel's competence ... is presumed, and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." (citation omitted)). Archuleta, therefore, has not shown that counsel rendered ineffective assistance in failing to locate and interview Archuleta's birth mother.

 ¶ 135 With respect to counsel's failure to present evidence that Archuleta had been sexually abused, Archuleta has not presented evidence that counsel performed deficiently. To the contrary, counsel testified that they considered the possibility of sexual abuse. Bullock unsuccessfully scoured the record for evidence of any such abuse, and Esplin repeatedly asked Archuleta whether he had been abused, but he repeatedly denied that he had. The abuse only recently came to light when Archuleta told Dr. Gummow and Dr. Cunningham that he had been abused. But beyond that confession, no evidence exists (let alone evidence that would have been available to trial counsel) that Archuleta had been abused. And although Archuleta generally avers that counsel could have pressed Archuleta harder for information related to past sexual abuse, he has not

shown that counsel's queries and search for evidence were unreasonable. And we see no reason for concluding that they were.

### (iv)

¶ 136 Finally, Archuleta finds fault in counsel's choice to employ a strategy at sentencing that Archuleta played only a minor role in the brutal torture and murder of Gordon Church. According to this argument, "the magnitude of [the] evidence [against Archuleta] possibly demonstrates that the defense counsel's decision to forgo a complete mitigation investigation and instead rely on its less-culpable party 'strategy,' based almost entirely on [Archuleta's] ill-advised testimony in his own defense, was itself an unreasonable one and justifies reversing his death sentence itself."

¶ 137 This claim fails because Archuleta cannot establish either *Strickland* prong. As to the first prong, Archuleta's assertions do not sufficiently "peg[ ] adequacy to 'counsel's perspective at the time' investigative decisions [were] made." *Rompilla*, 545 U.S. at 381, 125 S.Ct. 2456 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052); *see also Kimmelman*, 477 U.S. at 381, 106 S.Ct. 2574 ("The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. . . ."). Archuleta accordingly cannot demonstrate that counsel rendered deficient performance in its reasoned selection of a sentencing strategy.

¶ 138 From counsel's perspective, more fulsome introduction of Archuleta's harrowing past would have posed significant difficulties. For starters, a more robust mitigation case would have significantly undermined Archuleta's testimony at trial that he played a minimal role in Church's murder. The additional mental health and social history evidence that allegedly should have been discovered and presented show that Archuleta had a virulent hostility toward homosexuals as a result of his alleged prior assaults. The evidence also suggests that Archuleta suffered from irreparable psychological and brain damage that made him aggressive toward others and impaired his ability to control his violent conduct. Dr. Cunningham

repeatedly concluded, for example, that Archuleta's developmental deficiencies placed him at a high risk of engaging in violent criminal activity and that his psychological damage had a clear nexus to Church's murder. Contrary to Archuleta's professions of innocence, this evidence would have suggested to the sentencing jury that Archuleta likely played a principal role in torturing and killing Church. When confronted with "double-edged" evidence of this type, courts are reluctant to second guess counsel's choice to prefer an innocence over a mitigation strategy. *See, e.g., Royal v. Taylor*, 188 F.3d 239, 249 (4th Cir.1999) ("[R]eliance on evidence of psychological impairments or personal history as mitigating factors in sentencing can be a double-edged sword.") (internal quotation marks omitted).

¶ 139 Archuleta also asserts that trial counsel should have presented evidence similar to Dr. Cunningham's testimony that Archuleta would pose little threat if given a life sentence. But that evidence would have opened the door to the prosecution to introduce substantial aggravating evidence that through trial counsel's efforts was excluded at trial. Archuleta's child services, corrections, and Utah State Hospital records contained evidence that Archuleta committed an assault while housed at the Millard County Jail; that he authored a document detailing the protocol for home invasion robberies that advised shooting occupants when necessary; that he had a significant juvenile record, including four offenses that would have been felonies had he committed them as an adult; that he killed a kitten by beating it with a board with a nail in it; and that he was impulsive, manipulative, quick to anger, had "a type of gang-land structure [in the Hospital] in which he definitely [was] the boss," was obsessed with getting even, and fought repeatedly with and victimized other children at the Utah State Hospital. Had trial counsel introduced evidence that Archuleta would be peaceful if incarcerated, the prosecution would have been allowed to counter Archuleta's assertions of his peaceful nature by introducing this significant aggravating evidence. We decline to question counsel's decision to forgo certain mitigating evidence

in an attempt to prevent the jury from hearing further aggravating evidence. *Griffin v. State*, 866 So.2d 1, 9 (Fla.2003) (per curiam) ("Trial counsel is not deficient where he makes a reasonable strategic decision not to present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony."). It was accordingly not unreasonable for counsel to choose to present an innocence defense in lieu of the fuller mitigation case presented at the 2006 post-conviction hearing.

¶ 140 To conclude otherwise would be to require counsel to always present a mitigation case even where innocence may be the more reasonable or potentially successful strategy. The United States Supreme Court has never so held, and we decline to do so here. So long as trial strategy decisions are based on "thorough investigation of law and facts relevant to plausible options," they are "virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. The "principal concern in deciding whether [trial counsel] exercised 'reasonable professional judgment' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a defendant's] background *was itself reasonable.*" *Wiggins,* 539 U.S. at 522–23, 123 S.Ct. 2527 (alteration omitted) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). Thus, because trial counsel's decision to leave out certain mitigating evidence at the sentencing was based on a reasonable, thorough investigation into Archuleta's past, we conclude that counsel's decision was reasonable.

¶ 141 In any event, Archuleta cannot demonstrate prejudice in counsel's decision to employ an innocence strategy at sentencing. To show prejudice, Archuleta must not only demonstrate that "a competent attorney, aware of this [evidence], would have introduced it at sentencing in an admissible form," *id.,* at 535, 123 S.Ct. 2527, he must also show that "at least one juror would have struck a different balance," *id.* at 537, 123 S.Ct. 2527. *See also Strickland,* 466 U.S. at 695, 104 S.Ct. 2052 ("When a defendant challenges a death sentence ... the question is

whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). Archuleta cannot show that his sentence would have been different had counsel presented all of the mitigating evidence reasonably available to them.

¶ 142 Testimony was given at trial that Archuleta bound Church with tire chains, placed him in the trunk of his car, and drove seventy-six miles to a secluded area where Archuleta and Wood attempted to electrocute him through his testicles, savagely beat him over the head with a tire iron, and rammed the tire iron up his rectum eighteen inches, puncturing his liver. The evidence demonstrated that Archuleta controlled the relationship between him and Wood; that significant amounts of blood were found on Archuleta's discarded pants, but relatively little on Wood's clothing; that Archuleta stole Church's watch; and that after the murder he went to his girlfriend's apartment and had sex with her. The jury heard David Homer's testimony that Archuleta told him that murdering Church "was the ultimate rush, that there was—that you couldn't get any kind of high from any kind of drugs from it at all. [Archuleta] said that the evil had completely taken over him. And that once he started, they couldn't stop."

¶ 143 Moreover, contrary to the general tenor of Archuleta's claims on appeal, significant mitigation investigation *was* undertaken by trial counsel, and significant mitigation evidence *was* presented at sentencing. Archuleta's family testified concerning Archuleta's difficult childhood. They testified that he feared darkness and warm water, that when he came into their home he had burn scars on his body, and that he hoarded food. They described his lifelong struggle with hyperactivity and his difficulty concentrating. They also stated that he was loving toward them, his children, and the elderly. Dr. Howell testified concerning Archuleta's troubled childhood. He explained that Archuleta had low mental abilities and that he suffered from untreated ADHD. He gave as his expert opinion that this disorder made Archuleta susceptible to the behaviors of other peo-

ple, that it impaired his judgment, and that this explained why Archuleta participated in Church's murder.

¶ 144 In light of the overwhelming aggravating evidence set forth above, one cannot conclude that Archuleta's sentence is "only weakly supported by the record." *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052. While the mental health and social history evidence Archuleta argues should have been presented by trial counsel may have provided the sentencing jury with some additional insights into Archuleta's "character, background, history, and mental and physical condition," UTAH CODE ANN. § 76–3–207(2)(a)(ii), it would clearly have come at a price. The jury would have interpreted it as aggravating rather than mitigating insofar as it strongly suggests that Archuleta would be dangerous in the future and that he principally committed the brutal torture and murder. Moreover, its presentation would have opened the door for the prosecution to present additional aggravating evidence included in Archuleta's prison and Utah State Hospital records that were not presented to the jury. Given the substantial evidence presented by the prosecution in support of imposing a sentence of death against Archuleta, the additional information detailing Archuleta's psychological and neurological impairments and his traumatic childhood would not have overcome the prosecution's evidence in aggravation. *See Foster v. Ward*, 182 F.3d 1177, 1189 (10th Cir.1999) ("We have on numerous occasions determined that evidence of a troubled childhood involving physical, emotional, sexual and/or substance abuse does not outweigh evidence supporting the conviction and evidence supporting multiple aggravating circumstances; nor does evidence of low I.Q. and/or organic brain damage."); *Mills v. Singletary*, 63 F.3d 999, 1025–26 (11th Cir.1995) ("[B]ecause of the strong evidence of the aggravating circumstances surrounding the murder, we are convinced that no reasonable probability exists that the jury would have reached a different result had [the defen-

dant's] attorney presented the mitigating evidence allegedly available."). Archuleta, therefore, has not demonstrated that there is a reasonable probability that, but for trial counsel's alleged deficient performance, at least one juror would have concluded that the balance of aggravating and mitigating circumstances did not warrant imposition of a death sentence upon Archuleta.

¶ 145 We accordingly affirm the habeas court's rejection of Archuleta's claim that trial counsel rendered ineffective assistance of counsel by presenting, in Archuleta's estimation, a less than stellar mitigation case.

### C. Cumulative Error

¶ 146 Finally, Archuleta contends that all of the foregoing alleged errors constitute cumulative error, requiring the reversal of his conviction and sentence. But because Archuleta has "failed to establish any errors of counsel that prejudiced his right to a fair trial, the doctrine of cumulative error does not apply." *Parsons*, 871 P.2d at 530.

## ARCHULETA'S RULE 60(B) MOTION FOR RELIEF FROM JUDGMENT

¶ 147 While Archuleta's appeal of the habeas court's decisions to this court was pending, Archuleta's habeas counsel, Ed Brass, withdrew and was replaced by current counsel, James Slavens. With Slavens's assistance, Archuleta filed a motion in the habeas court requesting relief from judgment under rule 60(b) of the Utah Rules of Civil Procedure.[12] The court denied the motion, and Archuleta appealed the denial of his rule 60(b) motion to this court.

¶ 148 Archuleta's rule 60(b) claim contains two parts. First, he argues that the judgment of the habeas court should be set aside for reasons of "mistake, inadvertence, surprise, or excusable neglect." UTAH R. CIV. P. 60(b)(1). In particular, Archuleta claims that he "mistakenly relied" on Brass "to properly investigate, pursue and present all relevant

---

12. Archuleta also filed a motion pursuant to rule 59 of the Utah Rules of Civil Procedure, which allows a litigant to request a new trial based on specific reasons provided by the rule. The district court dismissed Archuleta's rule 59 motion, however, because it was not filed within "10 days after the entry of the judgment." UTAH R. CIV. P. 59(b). Archuleta does not appeal this decision of district court.

claims." Archuleta asserts that because he reasonably, but mistakenly, relied on Brass to provide him with effective representation, the habeas court's final judgment denying relief on his post-conviction claims should be set aside under rule 60(b)(1) on grounds of "mistake."

¶ 149 Second, Archuleta asserts that rule 60(b)(6)—which provides that a court may set aside a final judgment for "any other reason justifying relief from the operation of the judgment"—applies. In advancing this claim, Archuleta asserts nine counts of ineffective assistance of post-conviction counsel. These counts are that Brass: (1) failed to fully explore and present a claim under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the prosecution withheld information relating to an alleged confession by Lance Wood that he principally killed Church, or, in the alternative, that Brass failed to investigate trial counsel's ineffective assistance in relation to Wood's confession; (2) failed to properly investigate, pursue, and present evidence indicating that witness David Homer had recanted his testimony; (3) failed to properly investigate, pursue, and present evidence concerning the testimony of Gary Hawkins; (4) failed to properly investigate, pursue, and present evidence concerning a claim of mental retardation, which, if established, would exempt Archuleta from the death penalty under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); (5) failed to properly challenge trial counsel's representation on the ground that trial counsel did not call an expert to compare the psychological profiles of Archuleta and Wood; (6) failed to properly challenge trial counsel's representation on the ground that trial counsel did not retain a blood spatter expert, an expert to testify that Church was dead or had lost feeling prior to any torture or abuse, or an expert to testify that the battery cables used against Church would not have produced a significant electrical shock; (7) failed to properly investigate, pursue, and present evidence that the prosecution committed a *Brady* violation in failing to reveal that Martha Kerr, a forensic pathologist for the Utah State Crime Lab who testified for the prosecution concerning blood evidence, suffered a mental breakdown prior to her testimony; (8) failed to amend the second amended petition to include claims 1 through 30 that were previously, but erroneously, denied by the habeas court as procedurally barred; and (9) prejudiced Archuleta during the post-conviction mitigation case by presenting evidence that was more harmful than helpful.

¶ 150 The district court rejected Archuleta's claims under both rule 60(b)(1) and 60(b)(6). With respect to the rule 60(b)(1) claim, the court, among other things, found it to be untimely because it was not filed within "3 months after the judgment." UTAH R. CIV. P. 60(b). And after reviewing each of Archuleta's ineffective assistance of post-conviction counsel claims, the court also rejected his motion to set aside the judgment pursuant to rule 60(b)(6). Archuleta appeals these decisions of the district court.

¶ 151 We affirm. First, we agree that Archuleta's rule 60(b)(1) motion was not filed within three months of the final judgment of the habeas court and was therefore time-barred by rule 60(b). Second, we affirm the district court's denial of Archuleta's rule 60(b)(6) motion, but for reasons different from those of the district court. We hold that rule 60(b)(6)'s "any other reason justifying relief from the operation of the judgment" provision applies only in extraordinary circumstances which are not presented by this case. Accordingly, we find no need to examine each of Archuleta's rule 60(b)(6) claims individually as the district court did, even though we affirm that court's ultimate denial of Archuleta's motion.

¶ 152 Before discussing in greater depth our reasons for affirmance, we note the discretion district courts possess in assessing rule 60(b) motions for relief from judgment. "We grant broad discretion to trial court[s'] rule 60(b) rulings because most are equitable in nature, saturated with facts, and call upon judges to apply fundamental principles of fairness that do not easily lend themselves to appellate review." *Fisher v. Bybee,* 2004 UT 92, ¶ 7, 104 P.3d 1198. We accordingly "review a district court's denial of a 60(b) motion under an abuse of discretion standard of review," *Menzies v. Galetka,*

2006 UT 81, ¶ 54, 150 P.3d 480, rendering them "rarely vulnerable to attack," *Fisher*, 2004 UT 92, ¶ 7, 104 P.3d 1198. "[T]he court's discretion is not unlimited," however. *Lund v. Brown*, 2000 UT 75, ¶ 9, 11 P.3d 277. "As a threshold matter, a court's ruling must be 'based on adequate findings of fact' and 'on the law.'" *Id.* (quoting *May v. Thompson*, 677 P.2d 1109, 1110 (Utah 1984) (per curiam)). "A decision premised on flawed legal conclusions, for instance, constitutes an abuse of discretion." *Id.*

¶ 153 Moreover, relief from judgment under the "catch-all" provision in rule 60(b)(6) "is meant to be the exception rather than the rule" and "should be sparingly invoked and used only in unusual and exceptional circumstances." *Menzies*, 2006 UT 81, ¶ 71, 150 P.3d 480 (internal quotation marks omitted). Although "an attorney's negligence is ordinarily attributable to the client because an attorney acts as an agent for her client," *id.* ¶ 76, we have found unusual or exceptional circumstances where "an attorney willfully disregards a client's interests," or "acts in a grossly negligent fashion," *id.* ¶ 77. "In such circumstances, the attorney is not acting on behalf of the client but is blatantly disregarding his or her representative capacity and subverting the client's interests." *Id.* Thus, a district court may set aside a judgment under such a scenario pursuant to rule 60(b)(6)'s catch-all provision.

¶ 154 The district court in this case reviewed the parties' filings, held oral argument, and issued a lengthy, exhaustive memorandum decision denying Archuleta's rule 60(b) motion. We review that decision for an abuse of discretion.

## I. IN DENYING ARCHULETA'S RULE 60(b)(1) MOTION, THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION

¶ 155 Archuleta's rule 60(b)(1) motion was untimely. For this and other reasons, the district court dismissed his motion to set aside the judgment of the habeas court for reasons of mistake. We affirm.

¶ 156 A rule 60(b)(1) motion must be filed "not more than 3 months after the judgment ... was entered." UTAH R. CIV. P. 60(b). The final order of the habeas court on Archuleta's motion was filed on February 26, 2007. Archuleta filed his rule 60(b)(1) motion nearly two and a half years later, on July 17, 2009. Obviously, Archuleta did not file his rule 60(b)(1) motion within the three-month time frame provided by the rule.

¶ 157 Despite the delayed filing, Archuleta contends that he is entitled to advance a rule 60(b)(1) motion because "[a]ny untimeliness of motions was not through any fault of" Archuleta, but because Ed Brass rendered ineffective assistance of counsel. But as the district court reasoned, even were we to ignore the time period from the entry of the final judgment by the habeas court to the date when Brass was replaced by Slavens, nearly an additional year passed before Archuleta filed the rule 60(b)(1) motion. (Slavens was appointed on August 27, 2008.) We cannot reasonably interpret the timing provision provided by rule 60(b) to allow such delayed filing of a rule 60(b)(1) motion, and Archuleta accordingly is barred from arguing mistaken reliance.

## II. IN DENYING ARCHULETA'S RULE 60(b)(6) MOTION, THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION

¶ 158 We also affirm the district court's denial of Archuleta's rule 60(b)(6) motion. In so doing, we clarify the limited scope of our decision in *Menzies v. Galetka*, 2006 UT 81, 150 P.3d 480.

¶ 159 In *Menzies*, we overturned a district court's denial of a rule 60(b)(6) motion for relief from post-conviction judgment filed by death row inmate Ralph Leroy Menzies. We did so because Menzies' counsel "willfully disregarded nearly every aspect of Menzies' case," *id.* ¶ 1, and, "[i]n effect, ... defaulted Menzies' entire post-conviction proceeding, resulting in the dismissal of Menzies' case," *id.* ¶ 24. Under those "unusual and extraordinary circumstances," *id.* ¶ 71 (internal quotation marks omitted), we found that Menzies' inexcusable and grossly negligent representation constituted "any other reason justifying relief from the operation of the judgment"

dismissing Menzies' entire post-conviction case, UTAH R. CIV. P. 60(b)(6), and we remanded the case to the district court, instructing the court to set aside the proceedings that took place during the time that Menzies' counsel willfully abdicated his role as advocate.[13]

¶ 160 "[U]nusual and extraordinary circumstances" justifying relief under rule 60(b)(6) abounded in *Menzies*. Menzies' counsel "willfully disregarded nearly every aspect of Menzies' case." *Menzies*, 2006 UT 81, ¶ 1, 150 P.3d 480. "To say that [Menzies' counsel] did little to represent Menzies," we stated, "would be an understatement. In fact, [Menzies' counsel's] representation ... was deplorable. Our review of the record indicates that [Menzies' counsel] not only failed to provide Menzies with any meaningful representation, but in fact willfully disregarded nearly every aspect of this case. In effect, [Menzies' counsel] defaulted Menzies' entire post-conviction proceeding, resulting in the dismissal of Menzies' case." *Id.* ¶ 24.

¶ 161 Counsel's dereliction took many forms. For example, counsel "communicated with Menzies only sparingly throughout his representation. He discussed the issues in the case at length with Menzies only once—for one to two hours during an initial meeting—and thereafter rarely spoke with his client, appearing to deliberately avoid any communication." *Id.* ¶ 25. In fact, "[t]elephone records indicate[d] that Menzies attempted to call [counsel's] office literally hundreds of times but actually spoke with [counsel] or a member of his staff only on a handful of occasions." *Id.* Nor did counsel keep Menzies apprised of the progress of the case, "even though Menzies requested that he do so multiple times." *Id.* ¶ 26. Significantly, however, on the few occasions on which Menzies was able to get in contact with counsel or his staff, he was "reassured that [counsel] was taking care of things," *id.*, thus preventing Menzies from requesting new counsel.

¶ 162 Counsel also "never conducted or hired anyone to conduct an investigation/notwithstanding Menzies' requests and the fact that the record indicate[d] that extensive investigation on [Menzies' claims] was needed in order to properly litigate Menzies' claims." *Id.* ¶ 27. Counsel never even sought state funds that had been made available for the purpose of investigation, and he "did not consult Menzies' [prior] pro bono team about the case." *Id.*

¶ 163 Moreover, our decision in *Menzies* is replete with instances of counsel's complete failure to file briefs, responses, or affidavits when required. *See id.* ¶¶ 30, 33–37, 39. Counsel later acknowledged

> that he did not respond to any of the State's discovery requests because he had not done any investigation and therefore had no information to provide. [Counsel] also acknowledged that he could have informed the district court that he did not comply with discovery because of his failure to investigate and could have requested more time to do so. He did neither of these things.

*Id.* ¶ 35. These failures to respond carried dire consequences. "On June 27, 2001, the district court granted the State's motion [requesting that the court prohibit Menzies from introducing any evidence to support his claims beyond what was already in the record], thereby prohibiting Menzies from introducing any further evidence to support his claims." *Id.* ¶ 36. Counsel "did not tell Menzies about the court order or explain to Menzies that he could no longer investigate his claims." *Id.* And on October 29, 2001,

> the State moved for summary judgment. The State sought to dismiss Menzies' entire post-conviction petition, arguing that because Menzies could not introduce any further evidence to support his claims, the State was entitled to a judgment as a matter of law on the existing record. [Counsel] made no effort to defeat the State's motion; he ... subsequently stated

---

**13.** It is worth noting that although trial counsel in *Menzies* (Ed Brass) was the same lawyer who represented Archuleta at the trial in this case, counsel's performance in the two cases was dras-

tically different. As explained in detail below, Brass's performance in this case came nowhere near the level that he stooped to in *Menzies*.

that he did not even review the record to attempt to find disputed material facts. *Id.* ¶ 37.

¶ 164 Counsel's failures with respect to Menzies' attempted appeal to this court are especially troubling.

On February 11, 2002, [counsel] filed a notice of appeal with the district court indicating that he was appealing the summary judgment to the Utah Supreme Court. However, [counsel] did not file a docketing statement within the time required by rule 9 of the Utah Rules of Appellate Procedure, and this court dismissed the appeal. We then allowed Menzies to avoid the dismissal by filing a transcript request; [counsel] indicated that no transcript was required. We set a briefing schedule, but [counsel] never filed an appellate brief even though we twice granted him additional time to do so. The State filed a motion to dismiss the appeal, and [counsel] failed to respond. We dismissed Menzies' appeal on November 21, 2002, but indicated that if a brief were filed within ten days we would reinstate the appeal. [Counsel] never filed a brief, so we entered a notice of decision dismissing Menzies' appeal on December 19, 2002. [Counsel] did not inform Menzies of any of these developments.

*Id.* ¶ 39.

¶ 165 The litany of defaults does not end there. The *Menzies* court recounted one instance where counsel neglected to show up at Menzies' deposition, but instead sent one of his associates who was not "familiar with the case in any way." *Id.* ¶ 32. What's worse, when counsel's associate "arrived at the prison [for the deposition], Menzies did

not know who she was and was not even aware that the deposition was scheduled." *Id.* The court also noted that on another occasion, counsel "outright lie[d]" to Menzies regarding the status of the case, *id.* ¶ 38, and throughout the representation concealed the progress and procedural posture of the case from Menzies. In fact, counsel did not inform Menzies that the case had been dismissed until "nearly a year" later. *Id.* ¶ 41. And even then, he misrepresented to Menzies that it would not be too difficult to get the summary judgment set aside. *Id.*

¶ 166 In sum, Menzies' counsel's "egregious lawyer misconduct constitute[d] an exceptional circumstance." *Id.* ¶ 78. Counsel provided "virtually no representation" and "willfully disregarded nearly every aspect of Menzies' case." *Id.* ¶ 94. He "completely fail[ed] to subject the opposition's case to meaningful adversarial testing," and he "abandoned the required duty of loyalty to his client, . . . acted with reckless disregard for his client's best interests and, at times, apparently . . . inten[ded] to weaken his client's case." *Id.* ¶ 98 (internal quotation marks omitted). Menzies' counsel's "actions effectively forfeited the entire post-conviction proceeding itself[,] . . . result[ing] in the denial of the post-conviction proceeding itself." *Id.* ¶ 100. Menzies was therefore "entitled to rule 60(b)(6) relief due to the extraordinary circumstances of ineffective assistance of counsel [14] and grossly negligent representation." *Id.* ¶ 118.

¶ 167 Archuleta's representation during the habeas corpus proceeding in this case comes nowhere near the deplorable representation that we observed in *Menzies.* First, the habeas court repeatedly commend-

14. Archuleta seizes upon the *Menzies* court's conclusion that a petitioner in a post-conviction proceeding possesses a statutory right to the effective assistance of post-conviction counsel. *Id.* ¶ 82. In Archuleta's view, this judgment confers on him the authority to raise the sort of ineffective assistance of post-conviction counsel claims that he raises in the rule 60(b)(6) motion that is the subject of this appeal. That is, Archuleta contends that a post-conviction petitioner may advance claims of ineffective assistance of post-conviction counsel under rule 60(b)(6) even where there is no evidence that counsel rendered such deficient performance so as to forfeit the

entire proceeding. But as is clear from the above recitation of Menzies' counsel's extraordinarily derelict representation, only ineffective assistance of post-conviction counsel claims amounting to "willful and deliberate" inaction, *id.* ¶ 73, complete "forfeit[ure] [of] the entire post-conviction proceeding," *id.* ¶ 100, or "gross negligence," *id.* ¶ 105, qualify as "any other reason justifying relief from the operation of the judgment" under rule 60(b)(6). Occasional omitted claims do not constitute extraordinary or unusual circumstances sufficient to trigger the rule.

ed counsel, both for Respondent and for Archuleta, for their diligent representation in this complex case. In the second amended petition, Archuleta's counsel raised forty-three claims, many with numerous subparts. Counsel opposed summary judgment on the majority of those claims, even securing a trial on the broad class of claims dealing with trial and appellate counsel's mitigation investigation. Counsel engaged the services of Dr. Gummow and Dr. Cunningham to provide insight into Archuleta's childhood and mental health. Counsel filed briefs on time and responded to motions by the state and orders by the court where necessary. And counsel apprised Archuleta of the status of the case and communicated with him as reasonably required under the attorney-client relationship. In sum, there is no indication in the record, like there was in *Menzies,* that counsel effectively "defaulted" Archuleta's "entire post-conviction proceeding, resulting in the dismissal" of Archuleta's post-conviction case. *Id.* ¶ 24.

¶ 168 This conclusion is significant. As noted above, rule 60(b)(6) operates to set aside a judgment "only in unusual and exceptional circumstances." *Id.* ¶ 71 (internal quotation marks omitted). It is "to be the exception rather than the rule," *id.,* and in cases like this one where counsel diligently sought to serve his client's interests, rule 60(b)(6) cannot be used to provide a habeas petitioner repeated bites at the proverbial post-conviction apple. "In such circumstances, the attorney is not acting on behalf of the client but is blatantly disregarding his or her representative capacity and subverting the client's interests," representing "egregious lawyer misconduct." *Id.* ¶ 77.

¶ 169 Brass's representation in this case was not so extraordinarily deficient and grossly negligent so as to entitle Archuleta to relief under rule 60(b)(6). We accordingly decline to individually examine each of Archuleta's claims that his habeas counsel rendered ineffective assistance. The decision of the district court denying Archuleta's rule 60(b) motion for relief from judgment is affirmed.

## CONCLUSION

¶ 170 We have reviewed the many diverse and complex claims raised by Michael Archuleta in this brutal murder case. We are convinced that none have merit, and we accordingly affirm the various rulings of the habeas court rejecting those claims.

Justice LEE authored the opinion of the court, in which Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Judge KOURIS joined.

Having recused himself, Justice NEHRING does not participate herein; District Judge MARK S. KOURIS sat.